The **DENVER AND RIO GRANDE WESTERN RAILROAD CO.**

v.

The **UNITED STATES.**

No. 145–70.

United States Court of Claims.
Nov. 20, 1974.
As Corrected Dec. 6, 1974.

Michael C. Durney, Washington, D. C., for plaintiff; Stanley Worth, Washington, D. C., attorney of record for plaintiff; Hamel, Park, McCabe & Saunders, Washington, D. C., of counsel.

Richard D. Silvester, Washington, D. C., with whom was Acting Asst. Atty. Gen. Richard M. Roberts, Washington, D. C., for defendant; Gilbert E. Andrews Jr. and Theodore D. Yeyser Jr., Washington, D. C., of counsel.

Before LARAMORE, Senior Judge, and NICHOLS and KUNZIG, Judges.

On Defendant's Motion For Partial
Summary Judgment

NICHOLS, Judge:

Plaintiff, Denver and Rio Grande Western Railroad Company, brings this action to recover federal income taxes paid by it for the taxable years 1964 and 1965. We have jurisdiction pursuant to 28 U.S.C. §§ 1346(a)(1) and 1491.

Our decision is limited to the issues raised by the defendant's motion for partial summary judgment and the plaintiff's opposition thereto—namely, whether the amount of investment credit and depreciation deductions taken by the Railroad for the Cane Creek Branch for the taxable years in question was excessive. Both parties agree that the answer to this question depends upon whether the Railroad is entitled to a cost basis under Internal Revenue Code of 1954, § 1012[1] for the contingent liabilities it incurred to finance the construction of the Cane Creek Branch.

On March 2, 1961, the taxpayer-Railroad entered into a Trackage Agreement with Texas Gulf Sulfur Company (hereinafter TGS), whereby it agreed to arrange for the construction of a 39-mile spur line necessary to provide rail service for a TGS Potash Mine and Plant near Moab, Utah. The agreement provided that the taxpayer was to hold title to all but 3 miles of the line. However TGS was required to pay into an escrow account for the taxpayer the entire estimated cost of the project, with the exception of amounts expended by the taxpayer for rails and rail fastenings. The amounts advanced by TGS were to be refunded by taxpayer as follows:

After movement of 100,000 net tons in each year of the refund period the Railroad Company will refund on the basis of 32% of the revenue accruing to the Railroad Company on all carload freight traffic originating or finding destination on trackage covered by this agreement, or any extension to said trackage that may be made thereto until Industry's disbursements for construction are refunded, but not to exceed a period of 10 years next ensuing after the date of completion of the Track, said repayment to be made in semi-annual installments.

---

[1]. Hereinafter all section references are to the Internal Revenue Code of 1954.

In accordance with the above agreement TGS advanced the Railroad $7,784,350.59 of the $8,360,143.74 total cost of construction. TGS encountered unanticipated processing difficulties which temporarily made it impossible for it to ship sufficient quantities to merit any refunds. The parties therefore amended the agreement on July 22, 1964, to extend the payment period until 10 years after the date of the movement of the first 100,000 tons of potash. The 10-year period apparently begin in 1966, the year in which the Railroad made the first refund to TGS. To date the Railroad has reimbursed TGS as follows:

| | Amount | Balance |
|---|---|---|
| Total Advance by TGS | $7,784,350.59 | $7,784,350.59 |
| Refund Jan.–Jun. 1966 | (24,558.93) | 7,759,791.66 |
| Refund Jul.–Dec. 1966 | (129,320.15) | 7,630,471.51 |
| Refund Jan.–Jun. 1967 | (22,880.36) | 7,607,591.15 |
| Refund Jul.–Dec. 1967 | (258,222.94) | 7,349,368.21 |
| Refund Jan.–Jun. 1968 | (246,403.69) | 7,102,964.52 |
| Refund Jul.–Dec. 1968 | (314,986.84) | 6,787,977.68 |
| Refund Jan.–Jun. 1969 | (300,154.14) | 6,487,823.54 |
| Refund Jul.–Dec. 1969 | (360,396.85) | 6,127,426.69 |
| Refund Jan.–Jun. 1970 | (269,536.29) | 5,857,890.40 |
| Refund Jul.–Dec. 1970 | (54,266.34) | 5,803,624.06 |
| Refund Jul.–Dec. 1970 to adjust error | (228,364.24) | 5,575,259.82 |
| Refund Jan.–Jun. 1971 | None | 5,575,259.82 |
| Refund Jul.–Dec. 1971 | None | 5,575,259.82 |

Total amount refunded at December 31, 1971 _____ $2,209,090.77
Remainder of advance still to be repaid _____ $5,575,259.82

---

Plaintiff included the entire $7,784,350.59 advanced it by TGS in its cost basis of the spur line for purposes of computing its depreciation deductions and investment credit. The IRS sanctioned the use of this cost basis in its audit of the railroad's 1964 and 1965 tax returns. However, the IRS disallowed the investment credit with respect to certain items which it felt did not qualify for reasons irrelevant to this motion. The Railroad claimed a refund with respect to the disallowed items, and on May 5, 1970, brought this refund suit. In its answer the defendant prays for an offset premised upon the Railroad's using an incorrect cost basis for computing its depreciation deductions and investment credit for the years in dispute. The amounts presently involved are as follows:

| | Investment Credit Allowed On Audit | Correct Investment Credit According To Plaintiff | Correct Investment Credit Accordin To Defendant |
|---|---|---|---|
| 1964 | $179,734.34 | $585,210.04 | $38,850.48 |
| 1965 | Zero | Zero | Zero |

| | Depreciation Allowed On Audit | Correct Depreciation According To Plaintiff | Correct Depreciation According To Defendant |
|---|---|---|---|
| 1964 | $18,815.80 | $18,815.80 | Zero |
| 1965 | 37,631.64 | 37,631.64 | Zero |

---

On March 1, 1974, after this litigation started, the parties amended the Trackage Agreement so as to require the Railroad to continue to make refunds until all of the funds advanced by TGS are repaid. According to the plaintiff this

amendment was made because of unanticipated production difficulties encountered by TGS at the mine.

■ We cannot give retroactive effect to an amendment made long after the tax years involved. As the agreement then stood, payments would stop after 10 years whether the advances of TGS were then fully refunded or not. It was perfectly foreseeable that the 32 percent rate would never give the Railroad enough revenue to complete its repayment. Plaintiff has obtained and includes in its opposition to the motion an affidavit by a TGS official saying that TGS at all times since the original agreement date expected to recover the full sum advanced, and that TGS has never claimed investment credit for itself on account of the spur. We take this as true, but such unilateral expectations cannot alter the agreement terms themselves. As a common carrier, plaintiff could have earned revenue on the line other than from TGS ore, but the isolation of the region made this unlikely.

The amount of investment credit and depreciation deduction allowable to a taxpayer with respect to an asset is dependent upon the basis of such asset.

Section 38(a) allows an investment credit for investment in certain depreciable property. Section 46(a) provides that the amount of the credit is equal to 7 percent of the "qualified investment." "Qualified investment" is defined by § 46(c) as the applicable percentage (100 percent in the case of property having a useful life of 8 years or more) on the *basis* of new "section 38 property" placed in service by the taxpayer during the taxable year. "Section 38 property" is defined by § 48(a) as generally being tangible, .depreciable property. The basis for computing the investment credit is the same as that used for computing depreciation. See Treas. Reg. § 1.46–3(c)(1).

Section 167(a) provides that a depreciation deduction shall be allowed for the exhaution of property used in trade or business, or property held for the production of income. The basis for computing depreciation is pursuant to § 167(g) "the adjusted basis provided in § 1011 for the purpose of determining the gain on the sale or other disposition of such property." Section 1011 provides that the adjusted basis is its "basis (determined under § 1012 or other applicable sections * * *), adjusted as provided in § 1016."

■ As a general rule the Code provides in § 1012 that the basis of property to a taxpayer is its cost. The basis of property includes not just the taxpayer's equity, but also liabilities assumed or encumbering the property acquired. Crane v. Commissioner, 331 U. S. 1, 67 S.Ct. 1047, 91 L.Ed. 1301 (1947); Parker v. Delaney, 186 F.2d 455 (1st Cir. 1950); Manuel D. Mayerson, 47 T.C. 340 (1966). Since § 167(g) makes the amount of a taxpayer's depreciation deductions dependent upon its basis in the property subject to depreciation, the inclusion of liabilities in basis enables it to generate current tax savings far in excess of its equity investment. *See*, H. Calkins and K. Updegraft, Jr., Tax Shelters, 26 Tax Lawyer 493, 506–08 (1973), and Manuel D. Mayerson, *supra*, where the Tax Court permitted a purchase money mortgage to be included as 97 percent of the taxpayer's § 1012 cost basis despite the fact that the mortgage was without personal liability and no principal payments were due for 99 years.

In the present case the Railroad is attempting to increase its investment credit and depreciation deductions by including as part of its cost basis TGS' advances for the spur line which it might never have to repay. The defendant argues that plaintiff cannot include such liability in its basis for the spur line because of its highly contingent nature. Cited as authority are Columbus & Greenville Ry. Co. v. Commissioner, 42 T.C. 834 (1964), aff'd per curiam, 358 F.2d 294 (5th Cir. 1966); Albany Car Wheel Co. v. Commissioner, 40 T.C. 831 (1963), aff'd per curiam, 333 F.2d 653 (2d Cir. 1964); Reisinger v. Commissioner, 144 F.2d 475 (2d Cir. 1944);

Elizabethtown Water Co. Consolidated v. Commissioner, 7 T.C. 406 (1946). Defendant is willing to build up the basis only year-by-year as plaintiff paid for the spur.

The taxpayer contends that the above cases are inapposite since in light of the underlying facts and circumstances it could be predicted with "reasonable certainty" that the advances made by TGS would be repaid in full. We conclude that such a distinction cannot be made on these facts.

The underlying facts and circumstances relied on by the Railroad are as follows:

1. There is no uncertainty as to the amount to be refunded or the expectation of the parties that it would be refunded.

2. TGS fully expected to recover all of its advance to the Railroad based on the terms of the original Trackage Agreement entered into in 1961.

3. Despite the 10-year payback limitation in the 1961 agreement the parties always intended that the taxpayer continue to make refunds until all sums advanced were repaid. This is evidenced by the amendments extending the payback period made in 1964 and 1974.

■ It does not matter what the parties' subjective intentions were. Absent a binding obligation on the Railroad's part to repay all of TGS' advances' at the time the investment credit and depreciation deductions were taken we deem it impossible to value the obligation assumed. The Railroad's obligation to repay was contingent upon TGS' (1) shipping a sufficient volume from its Moab, Utah, mine, and (2) within ten years of the time. Innumerable happenings could prevent that which was intended by the parties from becoming a reality, e. g., strikes or labor shortage, a reduction in the demand for potash, or an advance in mining technology which would make the Moab, Utah, mine no longer economically feasible to operate. The assertion that the parties to the Trackage Agreement always intended that TGS be paid in full, no matter how long it took, does not reduce the uncertainty. It is mere conjecture that a publicly owned and regulated corporation, such as the plaintiff, will expend sums with which it is not legally obligated to part.

Reference to Denver & Rio Grande Western R.R. v. Commissioner, 32 T.C. 43 (1959), aff'd on other issues, 279 F.2d 368 (10th Cir. 1960), is absent from the parties' briefs. It concerned the determination of the same taxpayer's basis for railway sidings financed under a substantially similar agreement with a shipper. The determination of the basis was necessary to compute the loss after the sidings were retired from service.

The arrangement between the Railroad and the shipper in the earlier Denver & Rio Grande Western R.R. case is described by the Tax Court at page 44:

The petitioner, at the request of a shipper, would build a spur track or a related facility. * * * The portion of the total cost which related to the trackage on the petitioner's right-of-way and to which the petitioner acquired exclusive title and exclusive right of use was included in the petitioner's road property account * * *. The shipper was required to make a deposit with the petitioner at the time of construction of an amount equal to that portion of the total cost. The deposit was credited by the petitioner to an account entitled "Other Deferred Liabilities" and was to be refunded to the shipper, either in whole or in part, depending upon the number of cars moved over the spur track during the next 5 years. Any portion of the deposit which had not been refunded by the end of the 5-year period was credited to an account entitled "Donations and Grants" and the shipper lost all rights to refund of that portion.

* * * * * *

Relying on the Supreme Court's opinion in Detroit Edison v. Commissioner, 319 U.S. 98, 63 S.Ct. 902, 87 L.Ed. 1286 (1943), the Tax Court held that the

amounts not reimbursed to the shippers were not includable in the Railroad's basis because such amounts did not represent a gift by the shipper and did not cost the taxpayer anything. The fact that basis is being used in this instance to compute investment credit and depreciation is immaterial since the same rules apply for determining basis. The reliance upon *Detroit Edison* appears justified. That decision upholds the IRS in eliminating from the utilities' basis deposits exacted from customers for extension of facilities to them and not refunded. The Court says "cost" means "cost to the taxpayer." [P. 102, 63 S.Ct. 902.] In United States v. Chicago, Burlington & Quincy RR., 412 U.S. 401, 409, 93 S.Ct. 2169, 37 L.Ed.2d 30 (1973), the rule of *Detroit Edison* is reaffirmed and the apparently contrary result of Brown Shoe Co. v. Commissioner, 339 U.S. 583, 70 S.Ct. 820, 94 L.Ed. 1081 (1950), is restricted to instances where the customer intended to contribute to the taxpayer's capital.

Defendant's motion for partial summary judgment is granted and the petition is dismissed with respect to the claims dealt with in the motion.