ERNEST J. SAVIANO AND MARGARET SAVIANO, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 15926–81.    Filed May 18, 1983.

*Lewis H. Ferguson III, Stephen L. Urbanczyk,* and *Fairlea A. Sheehy,* for the petitioners.

*Robert R. Rubin* and *James F. Kidd,* for the respondent.

OPINION

SHIELDS, *Judge*: Each party has filed a motion for partial summary judgment with respect to the following issues:

(1) Whether or not a nonrecourse obligation undertaken by the petitioner in 1978 is too contingent to be treated as a bona fide indebtedness for tax purposes.

---

(2) Whether or not petitioner is at risk, under section 465,[1] respecting an amount received in 1979 from the purported sale of an option.

(3) Whether or not the purported option granted in 1979 is to be treated as a true option for tax purposes.

The parties have filed under Rule 121,[2] affidavits in support of their respective motions. For our consideration, they have also filed joint exhibits which contain not only the petitioners' income tax returns for 1978 and 1979 but also the promotional materials leading to the transactions in dispute as well as the legal documents underlying such transactions.

In their motions and in oral argument, the parties have agreed that, for present purposes, we may assume the various steps of the transactions in dispute were consummated in the manner set out in the stipulated documents. Consequently, no material fact appears to be in dispute and the motions appear to be in order.

For 1978 and 1979, Ernest J. Saviano and Margaret Saviano, husband and wife, filed joint income tax returns using the cash basis of accounting. At the time their petition was filed they resided in Wisconsin. Margaret Saviano is a party solely because she filed joint returns with her husband. Consequently, as used hereinafter, the word "petitioner" shall refer only to Ernest J. Saviano.

During both years, the petitioner, an airline pilot, was furnished with promotional packages by International Monetary Exchange (hereinafter referred to as IME), a Panamanian corporation. The packages touted the tax advantages to be obtained by the petitioner and other high-bracket taxpayers through "investments"[3] in a leveraged tax shelter known as "Gold For Tax Dollars." Although a different shelter was

---

[1] All statutory references are to the Internal Revenue Code of 1954 as in effect during the years in issue.

[2] Unless otherwise indicated, any reference to "Rules" shall be deemed to refer to the Tax Court Rules of Practice and Procedure.

[3] The Securities and Exchange Commission has brought suit against IME and one Gerald L. Rogers, a.k.a. T.T. Smith III, the purported controller of IME, as well as several other parties, for possible violations of the Securities and Exchange Acts of 1933 and 1934, 15 U.S.C. sec. 77, et seq., in connection with the offer and sale of "Gold For Tax Dollars" securities. *S.E.C. v. Rogers, et al.*, No. 80–04841-MRP (C.D. Cal., filed Oct. 30, 1980). In addition, at least nine States have issued orders halting sales of "Gold For Tax Dollars" within their jurisdictions.

promoted for each year, basically the two shelters were the same in the sense that both were designed to secure for the petitioner a tax deduction for an expense in the current year which was at least 4 times greater than the amount of his cash outlay. Technically, however, the shelters differed because the 1978 package contemplated the payment of a substantial portion of the deductible expense from the nontaxable proceeds of a nonrecourse loan, while in 1979, a substantial portion of the payment was to be made with the proceeds from the sale of an option which would be taxable in a subsequent year when the option was either exercised or was permitted to lapse.

The petitioner followed the instructions furnished by IME, made his "investment" in both years, claimed the suggested deductions on his tax returns, was subsequently advised by the respondent that the deductions were disallowed, and together with his wife, timely filed a petition with this Court.

### The 1978 Transaction

At some point in 1978, the petitioner learned of a gold mining venture in Panama which was being promoted as a tax shelter throughout the United States by IME under the name of "Gold For Tax Dollars."[4] The promotional materials distributed by IME offered high-salaried taxpayers, such as the petitioner, a means of sheltering their otherwise taxable income from Federal income tax on a ratio of 4 to 1. In other words, the petitioner was told by IME that for each $1 of cash he invested in the shelter in 1978, he could deduct $4 from his gross income.[5]

---

[4]Respondent has disallowed deductions totaling more than $120 million in such shelters involving approximately 3,000 taxpayers of whom about 175 have petitions pending in this Court.

[5]In 1978, IME explained the shelter as follows:

In brief, the law provides that as a miner you can deduct the development cost in the year incurred. By borrowing nonrecourse $3 for every $1 of your own and by paying the total funds out as development expenses this year, a 400% tax shelter occurs. (A 400% tax write-off will turn 50% of your tax liability into "spendable Cash" and the other 50% into a "Gold Asset.")

You can start with as little as $5,000 and in increments of $2,500 thereafter, but for illustration purposes, if you or your corporation needs a $100,000 tax write-off, you would:

1. Put up $25,000.

2. Borrow "nonrecourse" $75,000 (completely tax deductible under the 1976 Act and the

The plan outlined in the promotional materials contemplated that a taxpayer would authorize IME as his agent to acquire a mineral lease or claim on certain gold-bearing land located in Panama. The taxpayer would then deposit with IME cash equal to one-fourth of the amount of the deduction he desired for 1978, and would borrow from IME the other three-fourths on a nonrecourse obligation which would bear interest at 10 percent but which would be payable from and secured only by the taxpayer's mineral claim. As the taxpayer's agent, IME would then, during 1978, pay over the entire sum (the one-fourth deposited by the taxpayer, plus the three-fourths represented by the nonrecourse obligation) to a mining contractor for preparing the claim for extraction of the gold. IME's materials, including a tax-opinion letter,[6] assured the taxpayer that by the adoption of the above procedure, he could become a miner in 1978. As such, he would be entitled to deduct under section 616(a) as mine development expense the entire sum paid to the mining contractor, i.e., both his deposit plus the proceeds of the nonrecourse loan.

The petitioner, following the instructions of IME, proceeded with respect to 1978 as follows:

(1) He deposited $10,000 with IME after determining that 4 times that amount or $40,000 was the amount of the deduction he needed in 1978.[7]

---

1978 Tax Reform Act.)

   3. Pay the total $100,000 out as deductible development costs this year.

   4. Expect, based on assays and current prices, to recover a gold profit of approximately $50,000.

TAX BENEFITS

   1. $100,000 tax deduction from your taxable income this year.

   2. Realize a federal tax savings up to $70,000.

   3. Pay no taxes until *you decide* to sell the extracted gold.

RESULT: GOLD FOR TAX DOLLARS, PLUS UP TO $45,000 IN SPENDABLE CASH!

   [6]The opinion letter was not issued by petitioner's present counsel.

   [7]The instructions stated, in part:

"The minimum capital requirement is $5,000 which can result in a $20,000 tax write-off or 4 times the cash you invest. * * * The following chart correlates, cash requirement to tax write-off (deductible expenses) to cubic meters to be mined under your Mining Claim Lease Agreement."

| Cash development capital | Desired tax write-off (deductible expenses) | | Development cost per m³ | | Total m³ developed for mining |
|---|---|---|---|---|---|
| $5,000 × 4 | = | $20,000 | ÷ | $1.60 | = | 12,500 |
| 7,500 × 4 | = | 30,000 | ÷ | 1.60 | = | 18,750 |

(2) He obtained through IME a mineral claim on 25,000 cubic meters of gold-bearing land. He determined the number of cubic meters to be included in the claim by following IME's instructions to divide the desired deduction ($40,000) by the $1.60 per cubic meter to be paid the mining contractor.

(3) He and IME executed a document entitled "Mineral Loan Agreement" under which IME, as lender, agreed to advance to him, as miner, up to 75 percent of the estimated market value of the minerals located in his mineral lease. Any advances under the agreement were to bear interest at 10 percent per annum and were to be secured by a general lien in favor of IME upon all sales, accounts, or other proceeds resulting from his mineral claim or any minerals extracted therefrom. Under the agreement, IME was also entitled to a commission of 2 percent of the net amount of any sales made from the claim. The only security for the payment of any advance, interest, or commission due under the agreement was IME's general lien.

(4) He received through IME an advance of $30,000 under the above agreement.

(5) By his agent, IME, he paid $40,000 (his $10,000 deposit plus the $30,000 represented by the above advance) to a mining contractor to "prepare the claim to extraction."

(6) On his joint return for 1978, the petitioner claimed a deduction for the $40,000 as mine development expense. He

| $10,000 × 4 | = | $40,000 | ÷ | $1.60 | = | 25,000 |
|---|---|---|---|---|---|---|
| 12,500 × 4 | = | 50,000 | ÷ | 1.60 | = | 31,250 |
| 15,000 × 4 | = | 60,000 | ÷ | 1.60 | = | 37,500 |
| 17,500 × 4 | = | 70,000 | ÷ | 1.60 | = | 43,750 |
| 20,000 × 4 | = | 80,000 | ÷ | 1.60 | = | 50,000 |
| 22,500 × 4 | = | 90,000 | ÷ | 1.60 | = | 56,250 |
| 25,000 × 4 | = | 100,000 | ÷ | 1.60 | = | 62,500 |

"If a greater tax deduction is desired than indicated in the above chart, just divide your desired tax write-off by 4 and that will equal the cash capital requirement. To obtain the number of cubic meters that must be mined under the mining lease, divide the tax write-off you desire by $1.60."

\* \* \* \* \* \* \*

"After you have determined your cash capital requirement, expenses to be incurred and cubic meters to be mined, fill in the forms and proceed as follows:"

\* \* \* \* \* \* \*

"(6) Upon payment of the mining development expense, copies of the invoices and cancelled checks for mining services paid for by your agent, will be sent for tax purposes. Your records will include Mineral Claim Lease, Loan Agreement, Paid invoices, and cancelled checks all executed on or before December 31, 1978."

also claimed a refund of $15,865 from the $17,478 in income taxes which had been withheld from his salary as an airline pilot.

Section 616(a) provides for the current deduction of mine development expenses incurred after the existence of minerals in commercially marketable quantities has been demonstrated. For purposes of this motion, the parties agree that such quantities of gold existed in petitioner's mineral claim.[8]

The question we must decide is whether IME's $30,000 loan to petitioner was too contingent by its terms to constitute a valid obligation for which petitioner might claim a deductible payment.

The respondent argues that under the very terms of the mineral loan agreement, the repayment of the $30,000 is too contingent to be recognized for tax purposes. He further argues that this contingency must be considered in determining whether or not the petitioner actually paid this part of the development expense claimed in 1978. It is not enough merely to accept the fact that payment was made with borrowed funds; rather, we must examine the nature of the obligation underlying the payment. Respondent concludes that no payment of the $30,000 was made. Hence, the deduction is not allowable to that extent.

For his part, the petitioner first frames the issue as being one of pure tax accounting. He argues that the source of the funds, and any condition or contingency associated with the source of the funds or their repayment, is not relevant in this case. According to his argument, all he needs to establish as a cash basis taxpayer is that during 1978, a payment was made by him or on his behalf even though such payment was made with funds that were "begged, borrowed or stolen."

In the alternative, petitioner argues that if contingency is relevant to our inquiry on this issue, the repayment of the advance is not so uncertain as to destroy its validity for tax purposes.

---

[8]Sec. 616(a) states in relevant part:

SEC. 616(a). IN GENERAL.—Except as provided in subsection (b), there shall be allowed as a deduction in computing taxable income all expenditures paid or incurred during the taxable year for the development of a mine or other natural deposit (other than an oil or gas well) if *paid or incurred after the existence of ores or minerals in commercially marketable quantities has been disclosed.* * * *

We agree with the respondent that the petitioner has erroneously concluded that a payment for tax purposes is established merely by proof that money or other property has changed hands. The situations are too numerous to mention wherein this Court, in tax cases, and other courts, in many different areas, have examined all facets of a transaction in order to determine whether or not the parties have actually accomplished what they recited. To refrain, in cases of this nature, from looking at the underlying debt would require us to blindly examine each part of a transaction without considering the interrelation of each part to each other part or to the whole. Carried to its logical conclusion, the adoption of petitioner's argument in a future case could lead us to conclude that the exchange of funds recited in one part of a transaction constituted a payment when another part of the same transaction clearly provided for the repayment of the funds.

For these motions the parties agree that IME paid $40,000 to a mining contractor in 1978. They also agree that the entire payment would constitute a mine development expense, properly deductible under section 616(a), if, for tax purposes, the payment was made by the petitioner.

For the petitioner, a cash basis taxpayer, an allowable expense is deductible only in the year in which payment is made. *Helvering v. Price*, 309 U.S. 409 (1940). The word "payment" has a particular meaning in the tax law. Payment occurs only when a taxpayer's money is "irretrievably out of pocket." *Keller v. Commissioner*, 79 T.C. 7, 36 (1982), quoting *Ernst v. Commissioner*, 32 T.C. 181, 186 (1959). In general, if a taxpayer pays an expense with funds borrowed from a third party, the expense is deductible when paid, not later when the loan is repaid. *McAdams v. Commissioner*, 198 F.2d 54 (5th Cir. 1952); *Crain v. Commissioner*, 75 F.2d 962 (8th Cir. 1935); *Granan v. Commissioner*, 55 T.C. 753 (1971). But a contingent future obligation of a cash basis taxpayer is not deductible until the debt is actually paid. *Cavanaugh v. Commissioner*, 2 B.T.A. 268, 272 (1925).

In the application of these general principles, it has been repeatedly held that if a payment is contingent upon some future event, such payment cannot be recognized. *Brountas v. Commissioner*, 692 F.2d 152 (1st Cir. 1982), and *CRC Corp. v.*

*Commissioner*, 693 F.2d 281 (3d Cir. 1982), vacating and remanding on different grounds 73 T.C. 491 (1979); *Gibson Products Co. v. United States*, 637 F.2d 1041 (5th Cir. 1981), affg. 460 F. Supp. 1109 (N.D. Tex. 1978); *Denver & Rio Grande Western R.R. Co. v. United States*, 205 Ct. Cl. 597, 505 F.2d 1266 (1974); *Lemery v. Commissioner*, 52 T.C. 367 (1966), affd. on another issue 451 F.2d 173 (9th Cir. 1971); *Columbus & Greenville Railway Co. v. Commissioner*, 42 T.C. 834 (1964), affd. per curiam 358 F.2d 294 (5th Cir. 1966); *Albany Car Wheel Co. v. Commissioner*, 40 T.C. 831 (1963), affd. per curiam 333 F.2d 653 (2d Cir. 1964); *Redford v. Commissioner*, 28 T.C. 773, 777 (1957); *Sunburst Oil & Refining Co. v. Commissioner*, 23 B.T.A. 829 (1931).

In *Sunburst Oil & Refining Co. v. Commissioner*, a taxpayer's liability for expenses of drilling oil and gas wells was contingent and held not accruable since payment was to be made solely from the taxpayer's share of production from the drilled wells. Although the liability was fixed in amount, it would occur only "if and when sufficient oil was produced from the wells to pay it." 23 B.T.A. at 836.

*Sunburst Oil* differs from the instant case in that it concerned a deduction of an accrual basis taxpayer whereas Mr. Saviano reports his income and disbursements on the cash method of accounting. Nevertheless, we do not believe this distinction to be controlling. An obligation so indefinite that it may not be accrued similarly may not be expensed. The loan agreement herein makes clear that repayment is conditioned on the sale of gold from petitioner's claim. IME will be repaid only if and when sufficient gold is produced from the mine and sold.

More recently, the First, Third, and Fifth Circuits have ruled that an obligation, repayment of which was contingent upon future production of oil and gas, could not be accrued and deducted in the year that the amount of the liability became fixed. *Brountas v. Commissioner, supra; CRC Corp. v. Commissioner, supra;* and *Gibson Products Co. v. United States, supra.*

Those cases concerned limited partnership drilling ventures which bought participations in certain oil and gas leaseholds. The partnerships then contracted with the driller-operator of the leaseholds to drill exploratory wells. They paid 40 percent of the drilling costs in cash and gave nonrecourse notes for the

remaining 60 percent. Although the notes were secured by the leaseholds, as a practical matter repayment would occur only if oil were produced from the wells. There, as here, repayment was contingent upon the occurrence of a future event.

All three circuits held that the noncash portion of the drilling costs was not accruable by the partnerships or deductible by the limited partners. They held that the nonrecourse notes were too speculative to constitute bona fide liability, reasoning that "all events" necessary to fix the fact of liability had not occurred in the year the deductions were taken.[9]

We realize that some of the cited cases involved contingent future payments which were claimed by taxpayers on the accrual basis of accounting. Others involved attempts by taxpayers to add contingent future payments to the basis of assets for depreciation or some other amortizable purpose. We believe, however, that the underlying principles are applicable with equal force here. In other words, an item of expense which, under the terms of a document underlying the transaction, is too contingent for accrual purposes is obviously too uncertain to constitute a payment for cash purposes. Furthermore, a liability which, under similar circumstances, is too contingent to be allowed as a portion of a taxpayer's basis in an asset, because it is dependent in whole or in part upon a future event, would also be too contingent to be allowed as a cash deduction.

In this case, the petitioner is not personally liable for the repayment of the advanced funds. No term in the loan agreement requires him to pay his debt to IME nor does any term in the mineral lease or loan agreement require him to extract any gold or sell any gold which is extracted, both of

---

[9]Our opinion in *Brountas* did not reach the question of contingency inasmuch as we determined the nonrecourse notes therein to be production payments under sec. 636. We held that such characterization converted the notes into binding legal obligations regardless of whether repayment was speculative. *Brountas v. Commissioner*, 73 T.C. 491, 569 n. 84 (1979). The First and Third Circuits disagreed, holding that the character of a loan would not change merely because it was treated as a production payment. *Brountas v. Commissioner*, 692 F.2d 152 (1st Cir. 1982); *CRC Corp. v. Commissioner*, 693 F.2d 291 (3d Cir. 1982). Nothing in our opinion herein implies that we necessarily accept the views of the First and Fifth Circuit Courts of Appeals as to the role of sec. 636—the section upon which our decision in *Brountas* was founded.

which are conditions precedent to the payment of the advance.[10]

Moreover, the promotional literature in this case does not emphasize the soundness of the petitioner's investment nor discuss the activity which would be associated with the mining venture. For example, there is no discussion of the costs associated with production or who will bear them. In fact, practically all of the discussion and emphasis is on sheltering income from taxation with scant attention given to the problems and processes of extracting gold or selling the same.

It is clear that a cash basis taxpayer cannot deduct an expense incurred unless it has been paid during the taxable year. Section 1.461–1(a)(1), Income Tax Regs. The crucial question raised here is whether the nonrecourse obligation running from petitioner to his agent, IME, constituted payment of the development expense by petitioner so as to create a deductible expense in the year the note was executed. "[U]ntil a cash basis taxpayer suffers an economic detriment, i.e., an actual depletion of his property, he has not made a payment which will give rise to an expense deduction." *Rife v. Commissioner*, 356 F.2d 883, 889 (5th Cir. 1966), revg. 41 T.C. 732 (1964); see also *Jergens v. Commissioner*, 17 T.C. 806, 809 (1951).

This principle is analogous to that enunciated in *Helvering v. Price*, 309 U.S. 409 (1940), that a cash basis taxpayer's expenditures paid with a promissory note may not be deducted until the note is satisfied. *Eckert v. Burnet*, 283 U.S. 140 (1931). This is because if the note is never paid, the taxpayer will have given up nothing except his promise to pay. *Don E. Williams Co. v. Commissioner*, 429 U.S. 569, 578 (1977); *Hart v. Commissioner*, 54 F.2d 848, 852 (1st Cir. 1932). Similarly, an accrual basis taxpayer would not be permitted to deduct the amount of the note until the liability becomes certain. *Gibson Products v.*

---

[10]The promotional literature made clear that the petitioner controlled the timing of production and sale of gold. For example, a question and answer sheet stated:

11. Who determines when the claim shall be put into production?

> You do. As the miner, under the "Mineral Lease Agreement" you have complete control over the time when production takes place.

12. Do you have to agree to ever sell the gold to anybody?

> No.

The brochure stated "Pay no taxes until *you decide* to sell the extracted gold."

*United States, supra.* See also *Graf v. Commissioner*, 80 T.C. 944 (1983), decided this day, wherein cash basis taxpayers attempted unsuccessfully to deduct amounts paid to a dredging subcontractor which were borrowed from IME, an independent third party, in the form of a promissory note repayable only out of profits from the sale of oceanfront lots created by the dredging operation.

We conclude that with respect to petitioner's $30,000 "advance" from IME, petitioner did nothing more than attempt to create an artificial tax benefit. Consideration of the documentation alone clearly establishes that no actual obligation was intended or created and no economic detriment suffered for which a deduction can be allowed under section 616(a) or any other section.[11]

### The 1979 Transaction

In 1979, IME offered the petitioner and other similarly situated taxpayers a slightly different tax shelter. Once again, IME's promotional materials touted a 4 for 1 tax writeoff, but this time the gold-bearing land[12] was located in French Guiana and the plan was based in part on the sale of an "option"[13] rather than the nonrecourse loan which was used in 1978. The change from the nonrecourse loan in 1978 to the option in 1979 was admittedly made by IME because a change in the law had specifically eliminated the use of nonrecourse loans for years after 1978.[14]

---

[11]Our opinion is not changed by the recent United States Supreme Court opinion in *Commissioner v. Tufts*, 461 U.S. ___(1983), which held that where a taxpayer disposes of property encumbered by nonrecourse indebtedness in an amount that exceeds the fair market value of the property, the Commissioner may require him to include the outstanding amount of the obligation in his amount realized. The Supreme Court, relying upon the Commissioner's treatment and more than 35 years of judicial sanction, held that the debt should be treated as a true loan. The instant situation does not fit within the context of *Tufts* and *Crane v. Commissioner*, 331 U.S. 1 (1947). Our decision is based on the unreasonably and artificially inflated amount of the nonrecourse indebtedness which was not the fact in *Tufts*.

[12]For these motions the parties have agreed that gold in commercially marketable quantities was present in the claim.

[13]The terms "option" and "optionholder" as used herein are not intended to describe the character of the transaction under Federal tax law, but instead are used solely for clarity and convenience.

[14]The IME brochure stated:

HISTORY: In 1978 the International Monetary Exchange was able to negotiate for its

According to the plan outlined in the 1979 materials, the petitioner could qualify for the 4 for 1 tax writeoff by authorizing IME as his agent to acquire a mineral claim on certain gold-bearing land located in French Guiana. The petitioner would then deposit with IME cash equal to one-fourth of the amount of the deduction which he desired in 1979. Acting through IME as his agent, he would sell, for cash, an option to buy the gold extracted from the claim for an amount equal to the other three-fourths of the desired deduction. As in 1978, IME would then pay a mining contractor the entire sum (the one-fourth deposited by the petitioner plus the three-fourths received from the option) for preparing the claim for extraction of the gold.

In 1979, IME again assured the petitioner both in its own materials as well as in the accompanying opinion letter[15] that if he carefully followed the instructions provided, he would

---

clients a nonrecourse loan of $3 for every $1 of development equity on proven mineral reserves on a number of major placer gold claims. Under the 1978 Tax Reform Act, nonrecourse loans *can no longer be expensed and deducted from a U.S.A. citizen's adjusted gross income*. This problem is very easily resolved, and, in fact, improved upon through the sale of " *Gold Options.*"

CURRENT: A 400% or 4 to 1 tax shelter occurs when the following business transaction is entered into:

1. An individual or company leases a mining claim that needs to be developed. For illustration purposes: (cost of development is $100,000).

2. Instead of borrowing money on a nonrecourse basis, you sell a "Gold Option" for $75,000 to another third party who wishes to buy all the gold in the ground at approximately 50% of today's extracted and refined price for a period of time up to 8 years.

3. You hire a subcontractor to do the development work, add $25,000 of your own to the $75,000 option money and pay the contractor the total $100,000 this year to professionally develop the property so the auriferous vein flow is established and can easily be extracted.

RESULT: A $100,000, 4 to 1 write-off is created. Plus, the ordinary income is converted into a capital gain in the year the option *expires or is exercised* up to 8 years from now.

FOR EXAMPLE:

| | | | |
|---|---|---|---|
| 1. | Your adjusted gross income | | $125,000 |
| 2. | Lease claim 1979 income | 0 | |
| 3. | Option premium development cash | $75,000 | |
| 4. | Your cash | 25,000 | |
| 5. | Tax deduction (development expense) | 100,000 | (100,000) |
| | New 1979 adjusted gross income | | 25,000 |

In other words, you can use the option premium for the professional development and pay no tax until the option expires or is exercised. In the instant case, the optionee has up to 8 years to exercise his option. Under current law a short term capital gain of $75,000 will result in the above transaction. Mining claims are available for as little as $5,000 in personal development cash for a minimum $20,000 tax deduction (See Instructions).

[15]The *opinion letter was not issued by petitioner's current counsel.*

qualify as a miner and would be entitled to deduct under section 616(a) the entire sum paid to the mining contractor as a mine development expense. He was also assured that he would not be subject to tax on the proceeds received on the sale of the option until in some later year when the option either lapsed or was exercised.

The option could be exercised only after the commencement of production. As in 1978, petitioner was not required under the terms of the mineral claim or the option to extract any gold.

Again following the instructions furnished by IME, the petitioner proceeded as follows:

(1) He deposited $8,000 with IME.

(2) He obtained through IME a mineral claim on 20,000 cubic meters of gold-bearing land. He determined the number of cubic meters to be covered by the claim by following IME's instructions to divide the desired deduction ($40,000) by the $2 per cubic meter which had to be paid to the mining contractor.

(3) He sold through IME an option to purchase any gold extracted from his claim for $32,000.

(4) IME, as his agent, paid $40,000 (the petitioner's $8,000 deposit plus the $32,000 received for the option)[16] to a mining contractor to prepare the claim for the extraction of gold.

(5) On his 1979 joint income tax return, the petitioner claimed a $40,000 deduction as mine development expense. He also claimed a refund of $15,667 of the $19,914 in income taxes which had been withheld from his salary as an airline pilot. He did not report as income the $32,000 he received in 1979 for the option.

Respondent argues that petitioner's deduction should be denied to the extent of the $32,000 obtained from the sale of the option. He further argues that the option proceeds should be taxed in 1979 rather than deferred to a later year. He advances three grounds in support of his position: (a) The option transaction is the economic equivalent of a nonrecourse loan, governed by section 465 and regarding which petitioner

---

[16]The record at this point fails to disclose why the $40,000 deal as actually consummated in 1979 included a deposit of $8,000 and the sale of an option for $32,000 when IME's promotional materials and instructions would have required a $10,000 deposit and a $30,000 sale. In any event, the unexplained and favorable increase obtained by the petitioner in the tax writeoff from 4 to 1 to 5 to 1 does not affect our decision.

should not be considered "at risk"; (b) the arrangement was not an option but was in reality a sale of minerals in place based upon a formula for the division of the mining proceeds, and consequently, the proceeds did not qualify for tax deferral in 1979; and (c) the arrangement was not a true option, the proceeds of which would qualify for tax deferral, but was a contractual right of first refusal or preferential treatment, the proceeds of which should be taxed in 1979.

For his part, petitioner denies that section 465 governs the transaction; denies that the optionholder acquired an economic interest in his mining claim; and asserts that the arrangement created a binding, legal option, the income from which should not be recognized until the option is exercised or lapses.

In weighing the arguments of the parties, we have carefully considered all the documents submitted in connection with the 1979 transaction—the promotional materials, the authorization agreement, the mineral claim lease, and the option.[17] Because we decide for respondent on the basis of his third contention, we need not reach his other arguments.

Section 451(a) provides that an item of income shall be included in gross income in the taxable year in which received by the taxpayer unless the taxpayer's method of accounting would provide for recognition in a different taxable year. A cash basis taxpayer must include items of income in gross income in the year actually or constructively received. Sec. 1.451–1, Income Tax Regs.

The petitioner points out that one exception to these longstanding rules of recognition is that when it cannot be determined whether payments received will, at some future date, represent income or a return of capital, then they are not taxed until their character becomes fixed. *Burnet v. Logan*, 283 U.S. 404 (1931); *Dill Co. v. Commissioner*, 33 T.C. 196 (1959), affd. 294 F.2d 291 (3d Cir. 1961); *Virginia Iron, Coal & Coke Co. v. Commissioner*, 37 B.T.A. 195 (1938), affd. 99 F.2d 919 (4th Cir. 1938), cert. denied 307 U.S. 630 (1939).

---

[17]For purposes of these motions, the parties agree that the transactions in issue were imbued with economic substance. Nonetheless, we feel constrained to note that with or without economic substance the 1979 scheme, like that of 1978, both products of a fertile imagination, was carefully designed to avoid current taxation on otherwise taxable income. The sad feature is that their exotic nature has seduced thousands of taxpayers into a minimum investment of $2,500 followed at best by years of doubtful litigation.

Petitioner then argues that the proceeds received in 1979 from the sale of the option to purchase gold are not taxable until the option is exercised or lapses. He admits that the income will eventually be taxed at ordinary rates but contends that the cost of goods sold may affect the amount of taxable income to be reported, so that deferral is proper.

Respondent agrees that binding legal options are not taxed currently.[18] But he contends that no such option exists here. He maintains that IME merely labeled the 1979 transaction an option in order to invoke the principle of deferral. He points to the fact that contrary to the usual provision, the petitioner, even though grantor of the option, is actually the party with a choice. If the petitioner decides not to mine gold, the option-holder will never have the opportunity to purchase it. The respondent concludes, therefore, that this condition precedent to the exercise of the option negates the option's validity for tax purposes and requires the proceeds to be recognized currently.

For support, the respondent relies on *Saunders v. United States*, 450 F.2d 1047 (9th Cir. 1971). In *Saunders* the taxpayer obtained a "special option" to purchase real estate. The agreement provided, however, that the grantors could repurchase the option at any time prior to its exercise. When Saunders gave notice of an intention to exercise the option, the owners promptly repurchased it. Saunders treated the amount he received on the repurchase as capital gain. The Federal District Court agreed. *Saunders v. United States*, 294 F. Supp. 1276 (D. Hawaii 1968). The Ninth Circuit reversed the District Court and held the gain reportable currently as ordinary income. On account of the defeasance provision, the so-called

---

[18]Respondent's position on the includability of option payments in income has been published in Rev. Rul. 58–234, 1958–1 C.B. 279, 283, which provides in part:

"An optionor, by the mere granting of an option to sell ('put'), or buy ('call') certain property, may not have parted with any physical or tangible assets; but, just as the optionee thereby acquires a right to sell, or buy, certain property at a fixed price during a specified future period or on or before a specified future date, so does the optioner become obligated to accept, or deliver, such property at that price, if the option is exercised. Since the optioner assumes such obligation, which may be burdensome and is continuing until the option is terminated, without exercise, or otherwise, there is no closed transaction nor ascertainable income or gain realized by an optioner upon mere receipt of a premium for granting such an option. The open, rather than closed, status of an unexercised and otherwise unterminated option to buy (in effect a 'call') was recognized for Federal income tax purposes, in *A.E. Hollingsworth v. Commissioner*, 27 B.T.A. 621 (1933)."

special option did not qualify for deferral or treatment as capital gain under section 1234.[19] The Ninth Circuit commented:

As a consequence Owners were not bound to sell and convey; they were afforded an alternative. And for that reason the "Special Option" did not create a "privilege or option" entitled to be accorded capital gains treatment by 26 U.S.C. §1234. That section is limited in application to unilateral agreements which are inflexibly binding upon the purported vendor. * * * [450 F.2d at 1049.]

The common law principles applicable to option contracts are well settled. An option contract has two elements: (1) A continuing offer to do something, or to forbear, which does not become a contract until accepted; and (2) an agreement to leave an offer open for a specified or reasonable period of time.[20] *Koch v. Commissioner*, 67 T.C. 71, 82 (1976); *Carter v. Commissioner*, 36 T.C. 128, 130 (1961); *Drake v. Commissioner*, 3 T.C. 33, 37 (1944).

If the optionee's power to accept is dependent upon some further act of the offeror, then there is no unconditional option contract, rather the offeree has nothing more than a conditional preferential right of first refusal.[21] An offer that does not create an unconditional power of acceptance in the offeree has been called an illusory promise. See 1 A. Corbin, Contracts, sec. 145, and vol. 1A, sec. 261 (1963 ed. & Supp. 1982).

Applying the foregoing law to the agreement herein, we think it clear that petitioner's offer to sell extracted gold at a fixed unit price was illusory. This is so because the offer did

---

[19]Sec. 1234 prescribes rules for the income tax treatment of the grantor and grantee of an option in a closing transaction and where an option lapses, neither of which is at issue in the instant case. See sec. 1234(a) and 1234(b); sec. 1.1234–1, Income Tax Regs.

[20]1 Restatement, Contracts 2d, sec. 25 (1981), defines an option contract as a "promise which meets the requirements for the formation of a contract and limits the promisor's power to revoke an offer." Sec. 24 defines an offer as "the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." See *Bratt v. Peterson*, 31 Wis. 2d.447, 143 N.W.2d 538 (1966); see generally *Hermes v. William F. Meyer Co.*, 65 Ill. App. 3d 745, 22 Ill. Dec. 451, 382 N.E.2d 841 (1978).

[21]Professor Williston defines an option as "a contract to keep an offer open" for a certain period of time. 1 S. Williston, Contracts, sec. 61A (1957 ed. & Supp. 1982). He describes the nature of an option as a "unilateral contract which binds the optionee to do nothing but grants him the right to accept or reject the offer in accordance with its terms." Sec. 61B. See generally *Owens v. Upper Neches River Municipal Water Authority*, 514 S.W.2d 58 (Tex. Civ. App. 1974); *Puetz v. Cozmas*, 237 Ind. 500, 147 N.E.2d 227 (1958).

not create in the optionholder an unconditional power of acceptance. The so-called gold option, when construed from its four corners, appears to be nothing more than a preferential right of first refusal. As we view the agreement, the offeree's power of acceptance is severely limited by the condition that it is subject to the petitioner's decision to mine gold. The optionee has no power to compel him to produce. He has, at most, a mere expectancy of purchasing gold. *Booker v. Commissioner*, 27 T.C. 932 (1957).

Petitioner describes his financing vehicle as a "conditional option" and refers to the "conditional nature of the option." We have found no case law, nor has he cited us to any, in support of his hypothesis that such an option qualifies for tax deferral. To the contrary, the courts have treated such an "option" as vague and unenforceable. See *Saunders v. United States, supra; Booker v. Commissioner, supra*. We conclude that the right to purchase extracted gold was not a binding, legal option.

In summation, we conclude that there is no dispute as to any fact material to the motions for partial summary judgment and that a decision on the issues presented by such motions may be rendered as a matter of law. Accordingly, we hereby:

(a) Grant the respondent's motion for partial summary judgment to the effect that the nonrecourse obligation which the petitioner incurred in 1978 upon the execution of the mineral loan agreement is too contingent and uncertain to be considered a valid indebtedness for tax purposes, and deny the petitioner's motion to the contrary; and

(b) Grant respondent's motion for partial summary judgment to the effect that the purported option granted by the petitioner in 1979 is not a true option for tax purposes and the amount received in consideration therefore does not qualify for tax deferral; and deny the petitioner's motion to the contrary.

*An appropriate order will be entered.*