MARTIN J. KIRWAN AND GLORIA KIRWAN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Kirwan v. Commissioner
Docket No. 15696-90
United States Tax Court
T.C. Memo 1994-520; 1994 Tax Ct. Memo LEXIS 528; 68 T.C.M. (CCH) 965; October 18, 1994, Filed *528 Decision will be entered for respondent. Martin J. Kirwan, pro se.
For respondent: James W. Ruger and Patricia Anne Golembiewski. GOLDBERG
GOLDBERG
MEMORANDUM OPINION GOLDBERG, Special Trial Judge: This case was heard pursuant to section 7443A(b)(4) and Rules 180, 181 and 183. [1]
Respondent determined a deficiency in and additions to petitioners' Federal income tax for the taxable year 1982 as follows: Additions to Tax
Sec.
Sec.
Sec.
Year
Deficiency
6653(a)(1)
6653(a)(2)
6661
1982
$ 24,786
$ 1,239.30
[1]
$ 6,196.50
Respondent also determined that petitioners are liable for additional interest under section 6621(c) for the year in issue. After concessions by petitioners, [2] the issues for decision are: (1) Whether petitioners are liable for the addition to tax *529 under section 6653(a)(1); and (2) whether petitioners are liable for the increased rate of interest provided by section 6621(c) for substantial underpayment of income tax attributable to tax-motivated transactions. We incorporate by reference the stipulation of facts, the supplemental stipulation of facts, and the attached exhibits. At the time this petition was filed, petitioners resided in Carpinteria, California, and timely filed their 1982 Federal income tax return on cash basis of accounting. Martin J. Kirwan (petitioner) conceded that the mining program at issue here is the identical mining program that was the subject of Hodges v. Commissioner, T.C. Memo. 1992-370. Background of Hodges v. Commissioner, T.C. Memo. 1992-370
In 1981, Don C. Como formed International Recovery, Inc. (International), a California corporation. Mr. Como had no prior mining *530 experience and was a filmmaker by profession. International marketed the mining programs through a brochure describing the benefits of investing in the program. The brochure gave estimates of the expected profitability of the mines and the tax benefits of the investment. For a purchase price of $ 50,000, investors would purchase one unit of the mineral aggregate or ore derived from one of the available mine programs. The purchase price consisted of a cash investment paid from the investor to International in the amount of $ 10,000 and a note "secured" by the investor, payable to Lloyd's Insurance Company (Lloyd's), a financial institution operating out of the Bahamas. Furthermore, the investors would have to pay fees and royalties to extract the ore and gold. For example, investors were required to pay International 60 percent of the total gold and silver bullion produced. In exchange for this investment, each investor was entitled to the value of any gold, silver, and other valuable metals derived from the mine program. Another purported benefit offered by International was the deductibility of the total contract price in the year of investment for Federal income tax purposes. *531 International promoted three mine programs: (1) The Reward Brown Monster mine program (Reward Brown program); (2) the Cassill mine program (Cassill program); and (3) the Tiedeman mine program (Tiedeman program). The brochure distributed by International indicated that the investors were entitled to a Schedule C deduction in the amount of $ 50,000 in the first year of investment. The brochure further indicated that the note executed in favor of Lloyd's was to be repaid through the proceeds derived from the mining program. In 1985, the Securities and Exchange Commission (SEC) filed a complaint in the United States District Court against International and Mr. Como asking for an order of permanent injunction because the SEC considered the mining programs "Tax Shelters". The injunction was granted by consent decree and enjoined Mr. Como and International from marketing and selling the Tax Shelters and representing that investors in the Tax Shelters will be entitled to deductions for Federal income tax purposes. Furthermore, Mr. Como and International were enjoined from making false and fraudulent statements regarding, among other things, the existence of financing by third parties, *532 the use of funds for mine development, and the expectation of profit in gold mining programs. We decided in Hodges v. Commissioner, supra, that the International mining programs lacked economic substance and that the taxpayers entered into such transactions solely for tax benefits espoused in the marketing brochures. In so deciding, we stated: In short, the record demonstrates a complete failure by petitioners to make a proper evaluation of the mining programs and a marked indifference to the profit aspects of the various mining programs in which they took part. Their readiness to accept with no apparent reluctance an obligation of a royalty of 60 percent of the total gold and silver bullion produced from their mineral aggregate, their willingness to purchase a unit of mineral aggregate at some undeterminable location, and their willingness to accept the entire International package without negotiation and without questioning the reasonableness of the projected mining costs or the validity of the estimated income potential from their mineral aggregate belie a business purpose on the part of petitioners in entering these transactions. * * * *533 [Hodges v. Commissioner, T.C. Memo. 1992-370.]
We held that the International mining transactions lacked economic substance and the respondent in that case was sustained. Also, we held the taxpayers negligent under section 6653(a) and 6653(a)(1) because their actions showed an absence of any diligent and good faith effort to investigate the soundness of the mining programs. Furthermore, we held the taxpayers engaged in tax-motivated transactions and therefore were liable for an increased interest rate under section 6621(c). In the instant case, petitioner contends that the circumstances of his case differ from those of Hodges so that he was not negligent. Thus, petitioner argues that he should not be held liable for additions to tax under section 6653(a)(1), and he should not be held liable for additional interest under section 6621(c). Petitioner's Actions Before Investing in the Reward Brown Program
Petitioner was introduced to the mining program in 1981 through a business acquaintance, David Hite (Mr. Hite). Mr. Hite was an independent investor in the Reward Brown program and told petitioner about International and the Reward *534 Brown program. Mr. Hite had no experience in mining and was an accountant by profession. In the summer of 1982, petitioner drove to the Reward Brown mine to see the operations first hand. During that visit he was not permitted to enter the premises. However, he witnessed people working near the mine entrance. Also, petitioner attempted to contact Lloyd's, the financier, because he was concerned that, in his experience, most offshore financial companies were not stable. His contact with Lloyd's only revealed that the insurance company existed. After these two investigatory measures, petitioner contacted David Pierce (Mr. Pierce), counsel for International, to determine: (1) Whether enough mineral aggregate existed to cover the number of units of mineral aggregate that were projected for sale; and (2) the rate at which the note was discounted from Lloyd's to International. Mr. Pierce assured him that International had not sold too many units of mineral aggregate and stated that he could not give petitioner information regarding the discount rate that Lloyd's gave International, citing confidentiality concerns. Petitioner contacted Mr. Hite to determine the progress of the mining *535 program. Mr. Hite notified petitioner that the project was going forward but not at the rate at which he anticipated. Upon hearing that the mine was making modest progress, petitioner contracted with International in September of 1982. International was to remove mineral aggregate from a designated mine site within the Reward Brown program. At that time, petitioner signed the following documents: a Mining Agreement Force Majeure, a Mining Agreement-Assignment, a Processed Aggregate Purchase Agreement, and a "Full Recourse Promissory Note". The Mining Agreement Force Majeure provided that petitioner was to pay $ 10,000 in cash and $ 40,000 in the form of a note (note) payable to Lloyd's. In return, petitioner received a promise by International to process 1,400 tons of mineral aggregate only if a commercially valuable deposit was located. In addition to the cash and the note, International was to be paid $ 1.00 per gram of petitioner's extracted gold and silver for refinement and processing fees, and 60 percent of petitioner's extracted gold and silver for payment of a royalty. In an addendum to the purchase agreement, International/Missouri Mines reserved the right to make *536 substitutions of mineral aggregate. Where the purchaser engaged International as his mining contractor, International would agree under the Processed Aggregate Purchase Agreement to repurchase the mineral aggregate, after processing, for $ 1.50 per ton. Although petitioner attempted to verify independently some of the representations made by International, he relied exclusively on the representations of International and its agents in making the decision to invest in the mine programs. Petitioner did not inquire about the feasibility of having another mining company perform the extraction of the mineral aggregate. Petitioner used International only because the use of International was a prerequisite to obtaining financing through Lloyd's. If financing had not been available through Lloyd's, petitioner would not have invested in the mining program. Petitioner's Actions After Investing in the Reward Brown Program
In the year at issue, petitioners filed their Federal income tax return with the filing status of married filing jointly. Petitioner's occupation was attorney and his spouse's occupation was housewife. Petitioner reported income from compensation for services performed *537 for the law firm of Ives, Kirwan, and Dibble, a professional corporation, and claimed itemized deductions. Additionally, petitioner attached to his Form 1040 a Schedule C for his gold-mining activity and claimed that activity was on an accrual method of accounting. Petitioner deducted $ 50,000 as "mine development costs" consisting of both the $ 10,000 cash payment and the $ 40,000 note. After investing in the mine project, petitioner contacted a geologist, Mr. Sullwold, and a mining engineer, Mr. Johansen, for the purpose of obtaining their opinions as to the feasibility of the mining program. After petitioner provided the experts with general information about the mine programs, both Mr. Sullwold and Mr. Johansen stated that in order to get an accurate estimate of the feasibility of the program, on-site tests would have to be conducted at a cost of approximately $ 10,000. Petitioner did not pursue such studies because he believed that an additional expense equal to his investment in the mining program was economically prohibitive. In September of 1983, petitioner received a bill from Lloyd's indicating $ 4,000 was the amount of annual interest due on the note and petitioner *538 paid this amount by check. Early in 1984 petitioner and other investors heard from Mr. Hite that work was slower than anticipated and that money invested for the Reward Brown mine was being diverted to the Tiedeman mine. Mr. Hite suggested that a trust be established for the purpose of administering the interests of the participating members. Pursuant to this suggestion, petitioner contributed $ 5,000 to the trust, and the trust transferred his interest from the Reward Brown mine to the Tiedeman mine in accordance with the trust agreement and an addendum to the mining agreement. Petitioner and his fellow investors believed that the Tiedeman mine would be profitable because it was a strip mine which was less costly than the Reward Brown mine, a mine requiring tunneling deep below the surface of the earth. By October of 1986, the mining had not commenced and the trust decided to arbitrate the claim of one of the members, Ray Ira Verrett (Mr. Verrett), for the purpose of obtaining a money judgment and to allow Mr. Verrett to extract the mineral aggregate through a mining company other than International. Petitioner volunteered his services to conduct a hearing in front of an arbitration *539 association. The arbitration association awarded money damages to Mr. Verrett but denied him the right to extract the mineral aggregate using a mining company other than International. Negligence Additions
Section 6653(a)(1) imposes an addition to tax equal to 5 percent of the underpayment of tax if any part of the underpayment is due to negligence or intentional disregard of rules or regulations. Section 6653(a)(2) imposes an addition to tax in the amount of 50 percent of the interest due on the portion of the underpayment attributable to negligence. Negligence is defined as the lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 937 (1985). We also consider the experience and knowledge of the individual taxpayer involved when determining whether a taxpayer was negligent or intentionally disregarded rules or regulations. See Fihe v. Commissioner, T.C. Memo 1956-139, affd. 265 F.2d 511, 513 (9th Cir. 1958). Petitioner has conceded that he is liable for the income tax deficiency, exclusive *540 of additions to tax and increased interest. Prior to investing in the mining program, petitioner had no experience in the mining industry and relied on the promotional materials prepared by International for information about the investment. Petitioner argues at trial that he is not liable for additions to tax because he took measures to verify independently the validity of the investment, yet these measures provided little information which could be regarded as reliable. We find petitioner's attempts at independent verification to be unsatisfactory; as an attorney he should have exercised greater care. In his investment decision, petitioner relied upon the advice of the purveyor of the program. Considering the size of petitioner's investment and the proportionately large tax write-offs, further investigation was mandated. Saviano v. Commissioner, 765 F.2d 643, 654 (7th Cir. 1985), affg. 80 T.C. 955 (1983). The record before us does not support a finding that petitioner relied on the advice of competent and unbiased parties. Although petitioner consulted with a geologist and a mining engineer, he did so after making *541 his investment, and the information that he received was based on general suppositions. The conclusion of both individuals was that a thorough survey was required in order for them to render a meaningful opinion. Petitioner chose not to undertake such a survey. Thus, we cannot say that reliance on the advice of virtual strangers who promoted the program amounts to reasonable and prudent conduct. Furthermore, petitioner could not have reasonably relied on the opinions of the geologist and mining engineer insofar as they expressed an opinion based on the representations of the promoters of the program. Such reliance is not the type of activity that will overcome the addition to tax for negligence or intentional disregard of the rules or regulations. Rybak v. Commissioner, 91 T.C. 524, 565 (1988); Patin v. Commissioner, 88 T.C. 1086, 1130 (1987), affd. without published opinion 865 F.2d 1264 (5th Cir. 1989), affd. sub nom. Gomberg v. Commissioner, 868 F.2d 865 (6th Cir. 1989), affd. sub nom. Skeen v. Commissioner, 864 F.2d 93 (9th Cir. 1989), *542 affd. without published opinion sub nom. Hatheway v. Commissioner, 856 F.2d 186 (4th Cir. 1988). Accordingly, respondent's determinations with respect to the additions to tax for negligence are sustained. Increased Interest
Section 6621(c) provides for an interest rate of 120 percent of the adjusted rate established under section 6601 if there is a substantial underpayment (an underpayment which exceeds $ 1,000) in any taxable year attributable to one or more "tax motivated transactions". The increased interest rate applies to interest accrued after December 31, 1984, even though the transaction was entered into prior to that date. Solowiejczyk v. Commissioner, 85 T.C. 552 (1985), affd. without published opinion 795 F.2d 1005 (2d Cir. 1986). In Hodges v. Commissioner, T.C. Memo. 1992-370, we concluded, as we do here, that the only purpose of the mining program promoted by International was the avoidance or evasion of Federal income tax, and that the program was a factual sham. Petitioners in the instant case have not shown that their International transactions *543 are distinguishable from those in Hodges. We conclude on the basis of the stipulated facts and petitioner's admissions that the International mining transactions were tax motivated transactions, and therefore hold that section 6621(c) is applicable. To reflect the foregoing and the stipulations of settlement pertaining to other issues, Decision will be entered for respondent. Footnotes
1. All section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
1. 50 percent of the interest on the deficiency.↩
2. Petitioners conceded liability for the deficiency and the addition to tax under sec. 6661.↩