HAROLD A. CHAMBERLAIN and JANICE CHAMBERLAIN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Chamberlain v. Commissioner
Docket No. 22867-82.
United States Tax Court
T.C. Memo 1987-20; 1987 Tax Ct. Memo LEXIS 20; 52 T.C.M. (CCH) 1348; T.C.M. (RIA) 87020; January 12, 1987. *20 In 1977, C, a cash basis taxpayer and attorney, acquired 15 shares (a 10 percent interest) of stock in Kappa Selectune, Inc. (Kappa), a subchapter S corporation, for $60,000. Kappa was a newly-formed Texas corporation organized to engage in the business of promoting and marketing custom made cassette and eight-track tapes. Forty-five thousand dollars ($45,000) of the stock acquisition price was financed by issuance of a nonrecourse promissory note by Merchants Finance Co. (Merchants). The loan by Merchants was to be repaid from C's share of Kappa's receipts derived from its business operations. Held: The loan to C represented by the $45,000 nonrecourse note was too contingent to be included in C's cost basis for tax purposes. Estate of Baron v. Commissioner,83 T.C. 542 (1984), affd. 798 F.2d 65 (2d Cir. 1986); Saviano v. Commissioner,80 T.C. 955 (1983), affd. 765 F.2d 643 (7th Cir. 1985), followed. Robert I. White, for the petitioners. Ana G. Cummings and David H. Peck, for the respondent. GALLOWAY
MEMORANDUM OPINION GALLOWAY, Special Trial Judge: Petitioners Harold A. Chamberlain and Janice Chamberlain, husband and wife, filed a joint income tax return in 1977, using the *21 cash basis of accounting. Respondent determined a deficiency of $32,704.63 in petitioners' 1977 Federal income tax and an addition to tax of $1,655.23 under section 6653(a). [1] Petitioners were residents of Houston, Texas, at the time their petition was filed in this Court. Harold A. Chamberlain, a Houston attorney, will be hereinafter referred to as "petitioner." This matter is before us on the parties' cross-motions for partial summary judgment. The issue to be decided is whether a nonrecourse loan undertaken by petitioner is too contingent to be includable in his basis of corporate stock acquired in December 1977. [2] For the purpose of our rulings, the parties have submitted copies of petitioner's 1977 tax return, corporate tax returns, affidavits, promotional materials and legal and other documents *22 underlying the disputed transaction and extensive legal memorandums. Moreover, respondent has conceded, solely for the purpose of his motion (but not petitioner's motion), the following facts: (1) the transaction occurred as indicated in the underlying documents; (2) the entities involved in the transaction are unrelated; and (3) petitioner acquired certain shares of corporate stock by paying $15,000 cash and executing a $45,000 nonrecourse note for the balance of the purchase price. Background
On December 12, 1977, promotional materials, with a cover sheet captioned "Confidential Private Placement Memorandum" (the offering circular) were made available to potential investors of Kappa Selectune, *23 Inc. (Kappa or the Company). Kappa was a newly formed corporation organized under the laws of the Stater of Texas to engage in the business of promoting and marketing custom made cassette and eight-track tapes. The Company offered investors the opportunity to acquire 150 shares of no par value common stock, to be issued by Kappa at the price of $4,000 per share, a total capitalization of $600,000. Subscribers to stock were required to consent to election by the corporation to be taxed as a small business corporation under subchapter S by executing Form 2553. The offering circular and its related documents contain the pertinent provisions we must consider in disposing of these motions. First, a two-page preamble in the offering circular includes the following provisions: INVESTMENT IN THE COMPANY IS HIGHLY SPECULATIVE AND INVOLVES SUBSTANTIAL RISKS. SEE "RISK FACTORS". CONSEQUENTLY, THE PURCHASE OF SHARES SHOULD BE CONSIDERED ONLY BY PERSONS WHO CAN AFFORD A TOTAL LOSS OF THEIR INVESTMENT. * * * THE SHARES DESCRIBED IN THIS MEMORANDUM HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 ("1933 ACT") NOR THE SECURITIES AUTHORITIES OF ANY STATE, AND THERE IS NO PUBLIC OR OTHER *24 MARKET FOR SUCH SHARES, NOR WILL ANY SUCH MARKET DEVELOP. TRANSFER OF THE SHARES IS SPECIFICALLY RESTRICTED UNDER THE SUBSCRIPTION AND SHAREHOLDERS' AGREEMENT, AND INVESTORS IN THE SHARES WILL BE REQUIRED TO RETAIN OWNERSHIP OF THE SHARES AND BEAR THE ECONOMIC RISKS OF INVESTMENT FOR AN INDEFINITE PERIOD. CONSEQUENTLY, THE INVESTMENT DESCRIBED IN THIS MEMORANDUM WILL BE AVAILABLE ONLY TO THOSE INVESTORS WHOSE NET WORTH (EXCLUSIVE OF HOMES, FURNISHINGS AND AUTOMOBILES), EXCEEDS $75,000 AND WHO HAD FOR THE TAXABLE YEAR 1976, OR ANTICIPATE THAT FOR THE TAXABLE YEAR 1977 THEY WILL HAVE, INCOME A PORTION OF WHICH WAS OR WILL BE SUBJECT TO FEDERAL INCOME TAX AT A MARGINAL RATE OF 50% OR HIGHER. SEE "TERMS OF THE OFFERING". * * * SUCCESSFUL COMMERCIAL MARKETING OF THE PRODUCTS TO BE MARKETED BY THE COMPANY INVOLVES A HIGH DEGREE OF RISK (SEE "RISK FACTORS"). THE ESTIMATES AND PROJECTIONS CONTAINED IN THIS MEMORANDUM ARE FOR PURPOSES OF ILLUSTRATION ONLY, AND SHOULD NOT BE RELIED UPON. ANY ESTIMATE OR PROJECTION OF THE RESULTS OF THE COMPANY'S BUSINESS IS NECESSARILY PREPARED ON THE BASIS OF ASSUMPTIONS AND HYPOTHESES THAT ARE SUBJECT TO SUBSTANTIAL RISKS AND CONTINGENCIES COVERING AN *25 EXTENDED PERIOD OF TIME. THERE IS ABSOLUTELY NO ASSURANCE THAT (i) ANY OF THE POSSIBLE ECONOMIC OR TAX RESULTS OR BENEFITS DESCRIBED IN THIS MEMORANDUM WILL BE REALIZED OR (ii) THE ACTUAL AMOUNT OF ANY PROJECTED RETURN FROM AN INVESTMENT WILL OCCUR. The 16-page offering circular further emphasized the "Risk Factors" as follows: RISK FACTORS An investment in the common stock of the Company involves a very high degree of risk and is only suitable for persons with a substantial net worth who have a high proportion of their annual income taxable without regards to investment herein, at Federal income tax rates of 50% or more, and who can afford to bear the risks of a speculative investment and have no need for income from such investment. * * * 1. Competition.
The product to be distributed by the Company is based upon technology which is the subject of a pending patent application. There can be no assurance that the patent will issue, and because the music industry is highly competitive and the financial resources of potential competitions could be substantially greater than those of either the Company or the manufacturer, Franklin Industries, Inc. ("Franklin"), and because of the limited *26 record libraries currently available to Franklin, the product's competitive advantage could be lost. The success of the Company is dependent upon the success of Franklin's product line. 2. Acquisition of Record Libraries.
Despite the product's technological advantage, there can be no assurance that Franklin will be successful in acquiring record libraries with sufficient market appeal to allow the product to compete successfully in the music industry. 3. Management.
The Company is to be an active business entity with marketing responsibilities under the terms of a distributor agreement attached hereto (the "Distributor Agreement"). Therefore, the success of the Company is dependent upon its management, employees, agents, and subcontractors in performing such duties. Should the Company fail to perform such duties, the Distributor Agreement can be cancelled pursuant to its terms by Selectune, Inc., the United States Master Distributor. [3] *28 [Footnote added.] * * * 9. Use of Proceeds in Speculative Ventures.
The net proceeds of this offering, less $10,000 as a reserve for initial working capital requirements and $30,000 to be paid to Robert A. Ross Management, Inc., will be used by *27 the Company to pay the first installment of the distributorship fee to Selectune, Inc. as required under the Distributor Agreement. The distributorship involves the marketing and distribution of new and untried technology, and there is no assurance that any of the products are commercially viable or that any such products can be provided and sold at a profit. The Company cannot predict if and when any of the products will be marketed. * * * The offering circular contained the following provisions relating to financing and tax benefits available to investors: SUMMARY OF OFFERING * * * NON-RECOURSE BORROWING Various financial institutions have informally indicated a willingness to lend to the prospective Shareholders of the Company, an amount equal to three-quarters (3/4) of the acquisition cost of the stock they acquire on a non-recourse basis secured only by such Shareholders' stock in the Company, one-half of dividends received from the Company and the guaranty of Auburne Investments, Ltd. TAX CONSEQUENCES The Company intends to be an electing Small Business Corporation (Subchapter S corporation). If the distributorship fee paid by the Company is fully deductible by the Company, each Shareholder will be able to deduct his pro-rata share of such payment in the year paid. In order to obtain the status of a Subchapter S corporation, it will be necessary *29 for each Shareholder and his or her spouse to consent to the Company's election as a Subchapter S corporation. THREE-FOURTHS (3/4) OF THE SHAREHOLDER'S COST OF STOCK IN THE COMPANY CAN BE FINANCED THROUGH NON-RECOURSE BORROWING. THE ORDINARY TAX DEDUCTION BENEFITS AVAILABLE TO THE INVESTOR ARE SLIGHTLY LESS THAN FOUR TIMES HIS CASH INVESTMENT (EXCLUSIVE OF NON-RECOURSE BORROWING), REDUCED SLIGHTLY BY ORGANIZATIONAL EXPENSE AND AMORTIZED OVER SEVERAL YEARS. TERMS OF THE OFFERING * * * Non-recourse Borrowing Available to Investors
Shareholders desiring leverage may be able to borrow from a financial institution, on a non-recourse basis, three-quarters (3/4) of the funds used to purchase the Shares. The proceeds of such loan are to be directly disbursed into the account of the Company. Further, the availability of such financing is based upon the quaranty to be issued by Auburne Investments, Ltd., discussed herein and in no way implies an affirmative or independent evaluation of the business prospects of the Company and anticipated success of its marketing efforts as a distributor of the Selectune Concept. * * * The offering circular contained the following provisions concerning the *30 financing and development of Kappa's business operations: USE OF PROCEEDS The net proceeds from the private sale of the One Hundred Fifty (150) Shares offered hereby are estimated to be approximately $600,000. The proceeds of the offering, less $10,000 for organizational expenses and working capital and $30,000 to be paid to Robert A. Ross Management, Inc., will be used to pay the first annual installment of the distributor's fee more fully described in the Distributor Agreement. THE SELECTUNE CONCEPT The products to be marketed by the Company are cassette and eight-track tapes containing musical selections chosen by the consumers from songs or compositions in the record library of Franklin Industries, Inc.Franklin's unique manufacturing system * * * permits audio consumers to purchase cassettes or eight-track tapes recorded with the selections which they have chosen, rather than selections made by the tape producers or a single musical performer, group or orchestra. SELECTUNE, INC. Selectune, Inc., a newly formed Nevada corporation, acquired the United States marketing rights to the Selectune Concept and will be responsible for national and regional promotional efforts to market *31 the products manufactured under the Selectune Concept.Selectune, Inc. will negotiate and implement national promotional programs for the sale of the products of such marketing efforts by Selectune, Inc., as more fully described in Article 3, Commission Rates and Computation, of the Distributor Agreement. * * * NONE OF THE TRANSACTIONS BETWEEN SELECTUNE, INC. AND THE COMPANY CAN BE CONSIDERED ARM'S-LENGTH. THE COMPANY KAPPA SELECTUNE, INC. is a newly formed Texas corporation with no previous experience in the marketing and distribution of consumer oriented products. The Company was formed for the sole purpose of acquiring a distributorship territory from Selectune, Inc., the Master Distributor for the United States. * * * The Company will pay $560,000 [sic] to Selectune, Inc., each year for the nine (9) remaining years of the Distributorship Agreement, as an annual installment on the total distributorship fee. Investors are advised that the distributorship fee is not required to be used at any level of the marketing chain of the products manufactured by the Selectune Concept for enhancing the marketability of Franklin's product line or in furthering the interests of the distributorship *32 network. The Company is retaining $10,000 of the money raised by the offering of Shares hereby as initial working capital for the development of the distributorship territory and the organization of the corporation and for payment of salaries, consulting fees, legal fees or accounting fees. It is anticipated that this will provide sufficient initial working capital until the Company begins to receive revenue from the sale of products either in the Company's territory or nationally through the marketing programs of Selectune, Inc. * * * THE DISTRIBUTOR AGREEMENT Attached hereto is the Distributor Agreement between Selectune, Inc. and the Company, pursuant to which the Company has acquired rights to market and promote the products of Franklin manufactured under the Selectune Concept in the sales territory as described in the Distributor Agreement [4] *33 * * *. [Footnote added.] Exclusive Appointment:
The Distributor Agreement grants to the Company the exclusive right to market and promote the sale of custom designed eight-track and cassetts tapes manufactured under the Selectune Concept in the territory described in such Agreement. Selling Rights Reserved:
Selectune, Inc., as the United States Master Distributor, has retained certain exclusive rights as to the marketing of national accounts and national promotional efforts. Term:
The term of the Agreement is for ten (10) years, plus automatic renewal provisions, unless otherwise terminated as provided for in the Agreement. Commission Rates and computation:
On all orders attributable to the sales territory, the Company shall receive or be credited with seven and one-half per cent (7-1/2%) of the gross sales proceeds or fifty cents ($0.50) for each eight-track or cassette tape sold, whichever is less, plus sixty-five cents ($0.65) per tape, five cents ($0.05) of which shall be committed to advertising, as its compensation for such sales, and the balance of the gross sales proceeds shall be credited to Selectune, Inc. On national or regional "promotional" programs, determined in the sole *34 discretion of Selectune, Inc., the Company shall be credited with five per cent (5%) of the gross sales proceeds or ten cents ($0.10) per eight-track or cassette sold, whichever is less, plus twenty-five cents ($0.25) per tape and the balance of the gross sales proceeds shall be credited to Selectune, Inc. * * * Distributorship Fee:
In consideration for the distributorship rights granted under the Distributor Agreement, the Company shall pay to Selectune, Inc., the amount of $560,000 for the first year and $590,000 per year for the last nine (9) years during the ten (10) year term of the Agreement. The first annual installment of the distributorship fee is due in cash on or before December 31, 1977. The annual installments due and payable on or before December 31 of each succeeding calendar year during the initial term of the Agreement can be payable in the form of promissory notes. Commencing with December 31, 1987, and continuing for so long as the Agreement remains in effect, the annual installment of the distributorship fee is to be paid in cash to Selectune, Inc. Reserve:
Selectune, Inc., may reserve, in its discretion, any or all of the first year's sales proceeds credited *35 against the cash payment of the distributorship fee to insure the faithful performance of the duties and obligations of the Company and the payment of any promissory notes tendered in consideration of the distributorship fee. * * * GUARANTY OF FINANCING Auburne Investments, Ltd. ("Auburne"), has agreed to guarantee any and all loans made to Shareholders who desire to borrow up to seventy-five percent (75%) of the acquisition cost of their common stock. As compensation to Auburne for its guaranty of the Shareholder loans, a borrowing Shareholder will agree to pay to the guarantor his proportionate share, based upon his equity position in the Company, of five cents ($0.05) per each cassette or eight-track tape sold as attributable to the Company's sales territory pursuant to the terms of the Distributor Agreement, excluding such payment on sales of tapes made pursuant to national promotional campaigns. Petitioner reviewed the offering circular and attachments and arranged to purchase 15 shares of the 150 share Kappa common stock offering. In effecting this transaction, he executed on December 29, 1977, an 8-page Subscription And Shareholder's Agreement, as well as various other documents. *36 In the first paragraph of the above Agreement, petitioner acknowledged that: THE PURCHASE OF SHARES OF THE COMPANY'S COMMON STOCK INVOLVES A HIGH DEGREE OF RISK. THE SUBSCRIBER ACKNOWLEDGES THAT HE IS ACQUIRING THE STOCK AFTER ADEQUATE INVESTIGATION OF THE BUSINESS AND PROSPECTS OF THE COMPANY. THE SUBSCRIBER FURTHER ACKNOWLEDGES THAT HE IS NOT RELYING UPON THE ACCURACY OF ANY PREDICTIONS AS TO THE FUTURE GROWTH, PROSPECTS, OR DEVELOPMENTS OF THE COMPANY CONTAINED IN THE OFFERING CIRCULAR. FURTHER, THE SUBSCRIBER ACKNOWLEDGES THAT SUCH PROJECTIONS ARE BASED UPON THE JUDGMENT OF THE OFFICERS OF THE COMPANY IN THE LIGHT OF PRESENT CIRCUMSTANCES AND DO NOT CONSTITUTE WARRANTIES. * * * On December 29, 1977, petitioner also signed a Non-Recourse Commercial Note of $45,000 in favor of Merchants Finance Co. [5] (Merchants) for a nonrecourse loan to account for the balance due on purchase of his 15 shares of Kappa stock. Principal and interest on the note (at 8 percent) was payable to Merchants from petitioner "only from, and to the extent of his proportionate share of the gross income of Kappa Selectune, Inc. * * * equal to fifth cents ($0.50) per eight-track or cassette tapes sold at retail *37 * * * and twenty-five cents ($0.25) per tape sold by national promotional campaigns." The note further provided that Merchants "shall have recourse only to (petitioner's) share of 'receipts' * * * and other collateral held as security for the indebtedness evidence by this note." The note provided "additional security" to Merchants in the form of a pledge by petitioner to Merchants of his Kappa stock pursuant to a General Pledge Agreement executed by petitioner in favor of Merchants on December 29, 1977. In a separate "Continuing Guaranty" agreement executed December 30, 1977, Auburne Investments, Ltd. (Auburne), a Hong Kong corporation, guaranteed the indebtedness due from petitioner to Merchants on the nonrecourse note. The Motions For Partial Summary Judgment
A decision will be rendered on a motion for summary judgment if the *38 pleadings, answers to interrogatories, depositions, admissions, and any other acceptable materials, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that a decision may be rendered as a matter of law. Rule 121(b). The burden of proving that there is no genuine issue of material fact is on the moving party. See Adickes v. Kress & Co.,398 U.S. 144, 157 (1970); Ewart, Fiduciary and Transferee v. Commissioner,85 T.C. 544, 547 (1985); Graf v. Commissioner,80 T.C. 944, 946 (1983). The opposing party is to be afforded the benefit of all reasonable doubt, and any inference to be drawn from the underlying facts contained in the record must be viewed in a light most favorable to the party opposing the motion for summary judgment. Ewart, Fiduciary and Transferee v. Commissioner,supra at 547. This Court has previously considered cross-motions filed by parties with respect to the issue of whether repayment of nonrecourse obligations was so contingent as to preclude a deduction for tax purposes. See Saviano v. Commissioner,80 T.C. 955 (1983), affd. 765 F.2d 643 (7th Cir. 1985).We must resolve the issue of whether the nonrecourse note *39 of $45,000 given by petitioner to Merchants to acquire 15 shares of Kappa stock was too contingent to constitute part of petitioner's basis in that stock. Respondent has attached to his affidavit submitted in support of his motion the promotional offering circular and related documents, described above, as well as petitioner's 1977 tax return and the Form 1120S tax returns filed by Kappa for the years 1977-1982. The above documents are not in dispute, only the parties' legal interpretation placed on these documents. Petitioner has submitted various affidavits in support of his motion and in opposition to respondent's motion and respondent has countered with affidavits opposing petitioner's motion. It is well settled that when repayment of nonrecourse notes or similar obligations is dependent on uncertain future events, such factors may render the obligation sufficiently contingent so as to preclude the inclusion of the obligation in the taxpayer's tax basis. See Estate of Baron v. Commissioner,83 T.C. 542, 549-550 (1984), affd. 798 F.2d 65 (2d Cir. 1986) (depreciation deductions for master recording based upon $460,000 nonrecourse note payable solely from record sales proceeds *40 denied); Saviano v. Commissioner,supra at 961-965 (no deduction for mining development costs under section 616(a) based upon nonrecourse debt payable solely from mining proceeds); Denver and Rio Grande Western R.R. Co. v. United States,205 Ct.Cl. 597, 505 F.2d 1266, 1270 (1974) (liabilities incurred to finance railroad lines and which were payable based on percentage of freight traffic revenue); Lemery v. Commissioner,52 T.C. 367, 377 (1969), affd. on another issue 451 F.2d 173 (9th Cir. 1971) (obligation contingent on net profit from business); Graf v. Commissioner,80 T.C. 944, 953 (1983) (note payable solely out of profits from sale of properties created by dredging operations).Respondent, relying on the above and other cases, argues that the transaction by which petitioner acquired his Kappa stock included a nonrecourse note that is too contingent to be recognized as a part of petitioner's stock basis for tax purposes. In arriving at this result, respondent contends that not only must we examine the nonrecourse loan but all contingency factors concerning its probable repayment. Petitioner argues that since the stock was paid for, his total cost basis is automatically $60,000. *41 Relying on section 1012 and section 1.1012-1(a), Income Tax Regs., petitioner claims "that Kappa Selectune received $60,000.00 cash from Chamberlain in exchange for his stock, and thus, he has acquired a cost basis equal to the [$60,000] purchase price." According to petitioner, as long as the stock was paid for, either by him directly, or by another on his behalf, any further inquiry is irrelevant, i.e., he is entitled to a $60,000 basis in the stock even though "payment was made with funds that were 'begged, borrowed or stolen.'" Saviano v. Commissioner,supra at 960. We disagree. We rejected similar arguments by taxpayers in Graf v. Commissioner,supra at 949, and Saviano v. Commissioner,supra, wherein we stated in part: We agree with the respondent that the petitioner has erroneously concluded that a payment for tax purposes is established merely by proof that money or other property has changed hands. The situations are too numerous to mention wherein this Court, in tax cases, and other courts, in many different areas, have examined all facets of a transaction in order to determine whether or not the parties have actually accomplished what they recited. To refrain, in cases *42 of this nature, from looking at the underlying debt would require us to blindly examine each part of a transaction without considering the interrelation of each part to each other part or to the whole. * * * [Saviano v. Commissioner,80 T.C. at 961.] In this case, investors were repeatedly warned of many "risk factors" involved when investing in Kappa stock. [6] Investors were advised among other things, that: (1) Kappa stock would have no market and would not be transferable; (2) the product to be distributed by Kappa required securing of a patent, which although applied for, "may not issue"; [7] *44 (3) the music industry was highly competitive; (4) the financial resources of potential competitors could be greater than those of Kappa or Franklin, the manufacturer; and (5) Franklin's current record libraries were limited and it was uncertain that Franklin could succeed in securing sufficient record libraries "to compete successfully in the music industry." The "risk factors" repeatedly emphasized in the offering circular made the operational hurdles necessary to Kappa's successful business operations seem almost insurmountable. Although the offering circular devoted two pages of general *43 discussion to the statistical increase in tape recording and playback equipment sales in the United States during the years 1970-1975, no information was offered concerning marketing efforts contemplated by Kappa or Selectune, Inc., or how Kappa's projected operations could successfully compete in this allegedly growing market. [8] Moreover, there is no indication in the offering circular that any part of the initial cash distributorship fee of $560,000 paid to Selectune, Inc., was available for "enhancing" Franklin's manufacturing efforts or "furthering the interests" of the distributors. In fact, a careful review of the offering circular reveals that the most attractive factor to high income investors such as petitioner would be the potential tax benefits to be gained as a result of investment in Kappa stock. [9]
In Estate of Baron v. Commissioner,supra, *45 we were faced with a similar situation involving a taxpayer who purchase certain rights in a master recording in exchange for $90,000 cash and a $460,000 nonrecourse note payable solely out of the record sales proceeds. The taxpayer deducted depreciation based on the $90,000 cash paid and the $460,000 nonrecourse note. When we held that the obligation represented by the nonrecourse note was too contingent to be included in basis, we stated in part: Applying the contingency principal, we think it clear that the $460,000 nonrecourse note was too contingent to be includable in Sydney Baron's basis. The nonrecourse note specifically provided that payments were to be made "solely out of gross receipts" from the use of the rights in respect to the master recording. * * * Thus, it appears that the rights had no value apart from the income stream which might be generated.* * * The long and short of the matter is that, in the case before us, the value of the rights in the master recording lay solely in the anticiapted income stream derived from direct and total public acceptance and that Sydney Baron was liable on the nonrecourse note only out of his receipts from that income stream. If there *46 were no receipts, there was no obligation to pay * * *. Under these circumstances, there was no incentive for Sydney Baron to pay the note out of his other funds in order to preserve valuable property -- an element which the courts have found compelling in other cases involving nonrecourse obligations [Citations omitted.] * * * It is important to note that we are dealing herein with a nonrecourse note where the obligation to make the payments thereon is, by its terms, confined to the income which the asset involved produces, where direct and total public acceptance is a key element, and where the likelihood of such acceptance has not been demonstrated. * * * [Estate of Baron v. Commissioner,supra at 550, 552-553.] As in Estate of Baron v. Commissioner,supra in this case, petitioner is obligated, under the terms of his $45,000 nonrecourse note payable to Merchants, to make payments only out of the "income stream" or "receipts" resulting from his proportionate share of Kappa's income. If Kappa has no receipts or insufficient cash available to pay any amounts to petitioner as a Kappa shareholder, petitioner is not obligated to make payments on the note to Merchants. [10] *48 Nor is petitioner's *47 cause helped by the fact that he pledged his Kappa stock to Merchants as collateral for the $45,000 nonrecourse loan advanced by Merchants. Once again, any value attributable to the Kappa stock must have as its foundation the realization of income from Kappa sales. Petitioner has placed heavy emphasis on affidavits submitted by petitioner Harold Chamberlain and others, in resisting respondent's motion. Petitioner's 5-page affidavit related to his "investigatory trip to San Francisco" where he reviewed the offering circulars and talked to the principals of Selectune, Inc., regarding the "Selectune Concept." Petitioner states that he purchased Kappa stock as a result of his investigation, gave a nonrecourse note for $45,000 although he "could have paid the entire $60,000 investment * * * without borrowing any funds or by borrowing funds on a recourse basis." Petitioner also stated that to his knowledge, "neither Kappa Selectune, Inc., nor Selectune, Inc., had any financial arrangements with Merchants Finance Co. or Auburne Investments, Ltd., to facilitate the loan made to affiant." [11] These affidavits do not address the issue raised by respondent's motion, i.e., whether the $45,000 nonrecourse note is too contingent to be includable in petitioner's Kappa stock basis. Yet, petitioner argues that Graf and Saviano are distinguishable from this case since "the cash used to pay the *49 expense for which a deduction was denied was advanced pursuant to a nonrecourse loan from a related lender, the tax shelter promoter." We do not agree. Graf and Saviano relate to whether a nonrecourse note is too contingent to support a cost basis or expense deduction and reach a result which is not dependent on the fact that the lender was a related party who happened to be the tax shelter promoter. [12]
Petitioner has also failed to distinguish this case from Estate of Baron v. Commissioner,supra, claimed by respondent to be "directly on point." Although petitioner recognizes that in Estate of Baron, payment for the purchase of a recording, financed by a nonrecourse note was to be from record sales proceeds, he claims that Estate of Baron is limited to situations where "direct and total public acceptance is a key element, and where the likelihood of such acceptance has not been demonstrated." Nevertheless, *50 we believe that Estate of Baron relates directly to the issue we have before us. There, this Court found the disputed nonrecourse obligation too contingent to be included in basis irrespective of some possible value in the master recording rights. In this proceeding, we find, after considering the offering circular and the related documents, that public acceptance of the Selectune concept was not established by the "marketing studies" examined by petitioner, and that repayment of the $45,000 nonrecourse note was remote, improbable, and therefore, too contingent to be includable in petitioner's Kappa stock basis. Petitioner claims that Commissioner v. Tufts,461 U.S. 300 (1983), supports his view that "nonrecourse debt" is treated as debt for purposes of the Federal income tax laws. However, in Estate of Baron v. Commissioner,supra, we held that the master recording transaction was distinguishable from a real estate acquisition situation (as in Tufts), since "the underlying property has a potential value apart from the income stream which it is expected to generate." Estate of Baron v. Commissioner,supra at 552, n. 31. Petitioner also relies heavily on Millar v. Commissioner,67 T.C. 656, 660 (1977), *51 affd. in part 577 F.2d 212 (3d cir. 1978), as supporting his claim of a $60,000 cost basis in his Kappa stock, wherein we stated in part: The term "adjusted basis" is defined by the statute. Neither the statute nor the Crane case would deny the petitioners the right to increase their basis in this stock on account of the amounts contributed, regardless of the source of the founds. See sec. 1.118-1, Income Tax Regs.
Millar does not support petitioner's argument. The issue there was not whether nonrecourse notes were too contingent to be includable in stock basis but whether the taxpayers realized gain on surrender of their stock to the extent that the face amount due on the notes exceeded the adjusted basis of the stock. Finally, petitioner cites our recent opinion in Jackson v. Commissioner,86 T.C. 492 (1986), as being "instructive as to the issues argued by the Commissioner in Chamberlain." Jackson v. Commissioner,supra, was a complex case involving the acquiring by taxpayers and their partnership of territorial sublicenses to distribute specially designed tape recorders from the taxpayers' wholly owned corporate licensee. One of numerous issues raised by the Commissioner was *52 that nonrecourse notes used by the taxpayers and their partnership to acquire the sublicenses to distribute tape recorders and also used to contribute to an advertising cooperative were too contingent to support license amortization and advertising expense deductions. Petitioner relies on the following language in our Jackson opinion as support for his contention that the $45,000 nonrecourse note in issue was not excessively contingent: Although the nonrecourse notes given by petitioners in satisfaction of their obligations under the sublicenses provided for repayments based on the number of units sold, we do not find that this feature, standing alone, makes the notes too contingent. The notes were not payable solely based ob sales; although some of the liability was nonrecourse, it all contained definite due dates. The provision requiring payments based on sales can be viewed as merely requiring prepayments and not providing the sole method of repayment. * * * [86 T.C. at 525.] We fail to see how Jackson is helpful to petitioner's attempt to defeat respondent's motion. In Jackson, we found from the evidence presented at trial that the taxpayers had established the value of each *53 sublicense, they had an equity in the sublicenses to protect, and the notes in question had definite due dates. We concluded from these and other factors that the nonrecourse notes were not excessively contingent. Here, as stated previously, the express terms of the nonrecourse note provide that payment of the note is totally dependent on and therefore contingent upon "receipts" of Kappa. Petitioner is required to make nonrecourse note payments only out of his proportionate share of "receipts" from Kappa or as cash is available to the Company. The fact that petitioner pledged his stock to Merchants as security for a payment that, as of December 31, 1977, was unlikely to ever be made under the literal terms of his various agreements with Kappa and other entities cannot change the contingency characteristic of the nonrecourse note. In relying on Jackson, however, petitioner advances the contention that: the nonrecourse notes executed by Mr. Chamberlain likewise are not payable solely out of the profits of Kappa Selectune, Inc. The stock of Kappa Selectune, Inc. itself stands as additional security for those notes. In addition, the notes are guaranteed (personal liability) by Auburne *54 Investments, Ltd., and are ultimately due on a date certain. Thus, the Commissioner's Motion for Partial Summary Judgment presupposes factual findings that (i) the value of that stock, of the guaranty and of the corporation's underlying assets is not equal or in excess of the amount of the nonrecourse loan and (ii) the date certain for repayment of the note can be disregarded. There is no evidence whatsoever to support such a finding. Since the facts, on a motion for summary judgment, must be viewed in the light most favorable to the party being moved against, the Commissioner is clearly not entitled to judgment on his Motion for Partial summary Judgment. We cannot agree with petitioner's interpretation of the provisions of the nonrecourse note, which clearly provides that repayment of this note is to be made out of "receipts" from sales of Kappa products. Petitioner misconstrues the nature of this proceeding. In this action for partial summary judgment, we are not called upon to make a factual finding concerning the value of Kappa stock, or the underlying assets of the corporation.[13] We must decide, based on the record before us, whether petitioner's $45,000 nonrecourse note *55 is too contingent to be includable in his Kappa stock basis. As stated previously, we have found from a consideration of the offering circular and other documents alone that no actual obligation was intended or created and no economic detriment suffered for which petitioner would be entitled to include the nonrecourse note in his cost basis. See Saviano v. Commissioner,supra at 965. Other recent cases confirm our finding that the nonrecourse note in issue is too contingent to be considered as basis for tax purposes. In Thomas v. Commissioner,84 T.C. 1244, 1280 (1985), we remarked that "on numerous prior occasions * * * the existence of large nonrecourse notes in circumstances where it is unlikely that the notes will be paid is itself an indication that the primary objective of an activity is to generate tax deductions." [Citations *56 omitted.] In Thomas, we held the questioned nonrecourse note to be contingent in nature and payable only in the event local sales proceeds were realized despite the taxpayer's contention that the note "has been and will immutably be paid each and every year in the absence of mining." See also Vastola v. Commissioner,84 T.C. 969 (1985) (respondent's motion for summary judgment granted where nonrecourse note, on which payments were contingent on coal production and secured only by mining rights under a coal sublease, was too contingent to provide taxpayer with an allowable loss deduction); Scheid v. Commissioner,T.C. Memo. 1985-402 (nonrecourse note not includable in basis where there is not sufficient certainty as to repayment even though the fair market value of the security equals or exceeds the indebtedness); Snyder v. Commissioner,T.C. Memo. 1985-9 ($90,000 nonrecourse note was too contingent to be includable in taxpayer's basis where payments on the note were to be made only from taxpayers' gross receipts from speculative sales of record albums). In circumstances where the possibility of payments on nonrecourse notes is remote and the likelihood of repayment is uncertain, this *57 and other courts have consistently held that the amount of the note is too contingent to support a deduction for tax purposes. Accordingly, respondent's motion for partial summary judgment must be granted to the effect that the nonrecourse obligation for $45,000 which petitioner incurred in 1977 is too contingent to support a valid indebtedness for tax purposes. Where both parties submit motions for summary judgment each motion must be examined to determine if the moving party has established that there is no genuine issue as to any material fact and that a decision may be rendered as a matter of law. Take v. Commissioner,82 T.C. 630, 633 (1984), affd. 804 F.2d 553 (9th Cir. 1986). Petitioner's motion is premised on the theory that it is a "fact" that he was issued Kappa stock valued at $60,000. Petitioner then argues that any source of funds used to purchase the stock, whether cash, bank loans, nonrecourse loans or other sources, is irrelevant to a determination of cost basis of his Kappa stock. However, we have previously considered and rejected the same argument advanced by petitioner when resisting respondent's motion for summary judgment.See Saviano v. Commissioner,supra at 961. *58 Petitioner's 1977 loss was derived from the $590,000 loss reported by Kappa on its Form 1120S corporation return for the period beginning December 29, 1977 and ending December 31, 1977.Petitioner, a 10 percent shareholder, reported a distributive loss of $59,000 on his personal return pursuant to section 1374. Sections 1373 and 1374, as applicable to the year 1977, provide that in computing his personal income tax liability, a shareholder of a subchapter S corporation must take into account his pro rata share of the corporation's income or loss. However, to the extent relevant here, section 1374(c)(2) limits the deduction of losses by the shareholder to the adjusted basis of his stock. See section 1012, and section 1.1012, Income Tax Regs.
Petitioner has placed heavy reliance on numerous affidavits submitted to support his contention that his Kappa stock transaction results in a $60,000 costs basis and a $59,000 deduction derived from Kappa's 1977 Form 1120S return. Petitioner relies on (inter alia) the affidavit of James H. McAlister, an officer of Merchants, and a copy of McAlister's check for $45,000 to support his argument that the "check was disbursed to Kappa Selectune, Inc., *59 in accordance with instructions received from Mr. Chamberlain to advance the $45,000 being loaned directly to Kappa Selectune, Inc." However, there is nothing in this or other affidavits submitted by the petitioner, or the record as a whole, to show that petitioner will ever be "irretrievably out of pocket" [14] for the $45,000. Petitioner also argues that he didn't have to rely on nonrecourse financing with respect to purchase of the Kappa stock since he had sufficient financial resources to pay the $45,000 from his own assets. This is not what happened, however. What was actually done is determinative of tax treatment, not what might have been done. See Carlton v. United States,385 F.2d 238, 243 (5th Cir. 1967). Moreover, it is clear from this record that petitioner, as an investor in Kappa stock, had no intention of financing the transaction other than by executing a $45,000 nonrecourse note. Petitioner's affidavits have not established that he is entitled to include in his Kappa cost basis the amount of $45,000 represented by a nonrecourse obligation. In summary, we conclude *60 that there is no dispute as to any fact material to the motions for partial summary judgment and that a decision on the issues presented by those motions may be rendered as a matter of law. Accordingly, we hereby grant respondent's motion for partial summary judgment to the effect that the $45,000 nonrecourse obligation executed by petitioner on December 29, 1977, was too contingent to be includable in petitioner's cost basis of 15 shares of Kappa stock acquired by petitioner on that date, and deny petitioners' motion to the contrary. An appropriate order will be entered.
Footnotes
1. This case was assigned pursuant to section 7456(d) (redesignated as section 7443A(b) by the Tax Reform Act of 1986, Pub. L. 99-514, sec. 1556, 100 Stat.    ) of the Code and Rule 180. All section references are to the Internal Revenue Code of 1954, as amended and in effect for the taxable year in issue, and all references to "Rules" are to the Tax Court Rules of Practice and Procedure.↩
2. In his motion for partial summary judgment, respondent has phrased the issue as to whether the nonrecourse note signed by petitioner is "too contingent to be treated as true indebtedness for tax purposes." Petitioner, on the other hand, has framed the issue in terms of whether his basis in corporate stock includes "cash actually advanced by [p]etitioners or on their behalf in payment for the stock, when a portion of the cash constitutes nonrecourse loan proceeds from an unrelated lender."↩
3. Section 5.01 of the 6-page small print Distributor Agreement provides for a fee to be paid by Kappa as "Distributor" under the Distributor Agreement to Selectune, Inc., in "the amounts of $560,000.00 on or before December 31, 1977, and $590,000.00 on or before December 31 for the nine (9) remaining years." The first year payment was to be in cash pursuant to section 5.02(a). Commencing with December 31, 1978, and during the remainder of the initial term of the Agreement ending with the payment of December 31, 1986, payment of the distributor fee could be made in cash or by promissory note. Sec. 5.02(c) provides that commencing with December 31, 1987, the distributor fee must be made in cash. Nevertheless, sec. 2.04 provides in part that "[i]fthe Distributor's volume of business falls short of the agreed amount at the end of the fifth or any subsequent year during the term hereof, * * * either party shall have the option of cancelling this agreement upon three (3) months' advance written notice to the other party."
4. The Distributor Agreement, sec. 2.01, refers to a "territory described in Schedule A attached hereto and made a part hereof." However, Schedule A was not made a part of this record. Robert A. Ross, chief executive officer of Kappa Selectune, Inc., alleges in his affidavit that Kappa's distribution territory was the State of Kansas.
5. Merchants Finance Co., a Nevada Corporation, had offices at 235 Montgomery Street, San Francisco. Concerning disbursement of the $45,000 nonrecourse loan proceeds, petitioner addressed a letter to attorney James H. McAlister, Trustee for Merchants, and requested that the nonrecourse loan proceeds be disbursed directly to the account of Kappa Selectune, Inc.↩
6. The "risks" of investing in this transaction have similar characteristics to risks warned of in other shelter transactions considered by this Court involving deductions based on nonrecourse loan indebtedness. Cf. Fuchs v. Commissioner,83 T.C. 79, 85↩ (1984). 7. Petitioner argues that the patent application pending as of December 31, 1977, was later granted, but he declines to say when, stating that "the exact date that the patent is granted is not relevant to the issue before the Court * * * [only] the fact that the patent was granted." 8. The offering circular, when discussing "industry Review," represented that "[h]owever, there can be no assurance that the marketing experience in the Company's territory will follow this trend. Management believes that the increased availability of tape playback equipment and the interest of audio consumers in selecting and composing their own tape recordings as evidenced by the increased sales of blank tapes evidences a growing market which it hopes to penetrate. The Selectune Concept is new, however, and there can be no assurance that the growing prerecorded and blank tape market consumers will respond to the Company's marketing efforts." ↩
9. Cf. Thomas v. Commissioner,84 T.C. 1244, 1252 (1985), affd. 792 F.2d 1256↩ (4th Cir. 1986). Here, petitioner was in the 58% tax bracket before claiming his $59,000 deduction derived from Kappa's 1977 Form 1120S. His claimed deduction resulted in a decreased tax liability of over $30,000 before considering the $15,000 cash advanced to acquire Kappa stock.
10. Petitioner admits in his initial brief that Kappa's business has failed and petitioner's nonrecourse note will not be repaid from Kappa's receipts. Although, petitioner states "the undisputed material facts" are that "[d]uring 1977 through 1983, the business of Kappa Selectune failed, and the $45,000 note therefore will not be repaid to Merchants Finance Co. from the profits of Kappa Selectune," he nevertheless argues that the above "facts" are "legally irrelevant" in this Motion and Cross Motion" and should not be considered by us. However, as we stated in Graf v. Commissioner,80 T.C. 944 (1983), the post-1977 Kappa tax returns merely confirm what this record otherwise discloses, i.e., "the highly contingent and speculative nature of petitioner's obligations." See Graf v. Commissioner,supra at 948 n. 3. The Kappa returns reflect no sales income and a cash balance which declined from $10,000 as of December 31, 1977, to $942 as of December 31, 1978 and to $5 as of December 31, 1982.
11. The other affidavits are from officers of Merchants, Kappa and Selectune, Inc. which stated that the corporations were not "affiliated" or "related" to one another. ↩
12. In any event, for the purpose of his motion, respondent has conceded that the parties are not related to each other.↩
13. The record does not support petitioner's contention that the Kappa stock has any value as of December 31, 1977, much less value equal to the $45,000 nonrecourse note. Furthermore, the value of petitioner's interest in the "underlying" assets of the corporation would be at most 10% (petitioners' stock interest in Kappa) of $10,000 cash as of December 31, 1977.↩
14. See Keller v. Commissioner,79 T.C. 7, 29 (1982) (quoting Ernst v. Commissioner,32 T.C. 181, 186↩ (1959)).