WILLIAM M. BALLARD, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; WILLIAM M. BALLARD AND ROBBIN K. BALLARD, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Ballard v. Commissioner
Docket Nos. 39827-85; 39828-85.
United States Tax Court
T.C. Memo 1988-436; 1988 Tax Ct. Memo LEXIS 466; 56 T.C.M. (CCH) 153; T.C.M. (RIA) 88436; September 14, 1988. Carl M. Kuntz, for the petitioner William M. Ballard. Richard D. Holton and Joseph A. DiJulio, for the petitioner Robbin K. Ballard. William S. Garofalo and Nadine M. Alexander, for the respondent. *467 COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION COHEN, Judge: Respondent determined the following deficiencies in petitioners' 1980, 1981, and 1982 Federal income taxes and additions to tax in these consolidated cases: >100> >101> Additions to Tax
Sec.
Sec.
Petitioner
Year
Deficiency
6651(a)(1) [1]
6659
William M. Ballard and
1980
$  41,369.60
$ 2,387.30
--   Robbin K. Ballard
1981
116,596.70
--   $ 34,979.00
Docket No. 39828-85
William M. Ballard
1982
77,700.00
--   23,310.00
Docket No. 39827-85
Sec.
Petitioner
6621(d) [2]
William M. Ballard and *
Robbin K. Ballard *
Docket No. 39828-85
William M. Ballard *
Docket No. 39827-85
The issues remaining for determination are (1) whether petitioners are entitled to Schedule C losses and investment *468 tax credits during the taxable years in relation to William M. Ballard's purchase from Jackie Fine Arts of certain lithograph or serigraph packages; (2) whether petitioners are liable for additions to tax under section 6650; and (3) whether petitioners are liable for additional interest under section 6621(c). The liability of Robbin K. Ballard will ultimately be determined in accordance with a Stipulation of Settlement between her and respondent resolving an innocent spouse claim made by her. FINDINGS OF FACT Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference. Petitioners resided in Brentwood, Tennessee, when the petitions were filed. Petitioner's Activities
After graduating from college in 1973, William M. Ballard (petitioner) commenced a career in the securities and investment banking business. From 1973 until 1976, petitioner was employed by a Wisconsin investment firm as a branch manager. His duties included direction of registered representatives in the sale of securities, insurance products, limited partnerships, mutual funds, and individual financial planning. In May of 1976 petitioner joined *469 the investment banking firm of J. C. Bradford & Co. in Nashville, Tennessee, where he headed the financial services department. His primary responsibility there was to direct the firm into new business investment opportunities for ultimate sale to the retail clients of the registered representatives, expanding the firm's traditional lines of business such as stock, corporate and municipal bonds, and options. He sold mutual funds, insurance products, retirement plan programs, limited partnership interests and investments in real estate development, research and development, equipment leasing, and oil and gas. Petitioner was considered an expert in organizing partnerships and transactions which would generate tax losses for investors. Petitioner left J. C. Bradford & Co. in 1984, but remained in the investment banking business through the time of trial in 1987. Petitioner, who was contacted frequently in his job by sponsors and promoters of investments, first became aware of the sale of "art masters" in 1977 or 1978, when visited by a representative of Jackie Fine Arts, Inc. (Jackie). Jackie's art masters consisted generally of silkscreen mylars, lithographic plates and mylars, *470 or photoscreen negatives of an original work of art, together with related copyrights. Jackie began marketing art masters in about 1977 and stopped selling them in 1982 or 1983. During this period Jackie sold over 2,200 art masters. Initially, Jackie used nonrecourse financing with respect to long-term notes with purchasers, but in 1979 they changed to partial nonrecourse notes. In marketing the art masters, Jackie provided prospective purchasers a prospectus, or "Information Memorandum," which emphasized at great length the tax benefits of the acquisition of art masters. A typical Information Memorandum, dated March 1980, contained a 2-page summary and illustration of tax consequences, two letters regarding defense against challenges by the Internal Revenue Service or local taxing agencies, and one 15-page and one 38-page tax opinion, out of a total of 68 pages. The illustration of tax consequences yielded an "equivalent write-off" of 4.4 to 1 during the first 2 years after the purchase of an art master. Petitioner received similar or identical materials before investing in art masters. Jackie generally would acquire the copyrights and reproduction rights to images (the *471 packages) by first entering into a standard Option Purchase and Security Agreement with the artist. Each agreement would set forth the number of packages covered and the purchase price of the package, payable by cash and a long-term nonrecourse note, and other terms. The note would be secured by Jackie's security interest granted by the ultimate purchaser in the resale agreement and note. Petitioner's interest in art masters, minimal at first, developed gradually. In 1978 or 1979 petitioner encountered Jackie representatives again at a convention of the International Association of Financial Planners. Over the next 2 years, on about 12 occasions, petitioner consulted Jackie representatives, art distributors, and gallery representatives concerning the retail prices of art products. He was told that, depending on the artist and his background, limited edition prints might sell for $ 150 to $ 500; fine art editions not signed by the artist but signed in the plate, $ 100 to $ 150; poster art, $ 25 to $ 50; and ancillary products, such as playing cards, tapestries and novelty items, $ 5 to $ 5,000. He also obtained from Jackie a list of and biography on each artist they had under *472 contract and tear sheets or copies of the images for purposes of selecting specific works if he decided to purchase a package. Petitioner and Jackie, by Herman Finesod, President, executed a Purchase and Security Agreement with respect to the art master "Triumph" by Jack Brusca (Brusca) on December 30, 1980, and with respect to "Piazza Navonna, Rome" ("Piazza") by Wayne Ensrud (Ensrud) and "Final Spring" by Michael Knigin (Knigin) each of December 31, 1981. In the course of negotiations with Jackie over purchase terms, petitioner obtained 3- or 4-month deferrals on the due dates of the proposed short-term notes for each art master. Petitioner also obtained approximately 10-percent discounts on the asking price for "Piazza" and "Final Spring." Pursuant to the agreements, the purchase prices were payable under the following stated terms: Triumph
Cash Portion:
Cash on Closing
$  18,750
Due June 30, 1981
(Short Term Note)
18,750
Deferred Balance, Due
January 15, 1994
(Long Term Note)
227,550
Recourse Portion
$  66,000
Nonrecourse Portion
161,500
Total Purchase Price
$ 265,000
Piazza
Final Spring
Cash Portion
Cash on Closing
$   2,500
$   2,500
Due on 6/1/82
(Short Term Note A)
7,400
17,525
Due 6/1/83
(Short Term Note B)
12,150
24,525
Deferred Balance
Due January 15, 1995
(Long Term Note
164,950
280,450
Resource Portion
164,905
$ 280,450
Nonrecourse Portion
0   0   Total
$ 187,000
$ 325,000
*473 The terms and conditions of each agreement otherwise were substantially similar. Each agreement allocated $ 1,000 of the purchase price to the "Copyright." An additional $ 4,500 in each agreement was specified as "Cost of Production of Limited Edition" of two artist's proofs of each art master, plus 200 prints of "Triumph," 300 prints of "Piazza," and 225 prints of "Final Spring." Petitioner agreed to interest rates on short-term notes and long-term notes of 10 percent and 9 percent per annum, respectively. The interest on each long-term note was nonrecourse. To secure payment of each note, petitioner granted Jackie a security interest in the "collateral," defined as the art master, unsold products created from the art master, all accounts, contract rights, inventory, and intangibles; petitioner also agreed to assign to Jackie 50 percent of the net receipts relating to the art masters until the notes were satisfied. Each agreement further provided that Jackie would accept title to the collateral in partial or full satisfaction of the long-term note to the extent of the "the appraised fair market value of the Collateral at the time of foreclosure." Petitioner made the following *474 payments by check to Jackie with regard to the art masters: Date
Amount
Art Master
December 31, 1980
$ 18,750 Triumph
December 31, 1980
2,250 Triumph
December 31, 1981
5,000 Piazza and Final Spring
August 13, 1982
7,400 Piazza
Limited edition prints, in the quantities set forth in petitioner's contracts, and artist's proofs were printed for each of the three art masters. Petitioner did not receive the prints until June and July 1982. Petitioner also received the mylars and metal plates from which additional original prints could be produced. No other items were produced from the art masters. At petitioner's request, Jackie provided him with a list of art distributors. Otherwise, Jackie provided no assistance with the marketing or distribution of the prints. After receiving his prints in 1982, petitioner contacted Marvin Elson (Elson) of Arverne Art International, Ltd. (Arverne), a New York art distributor, about marketing the prints. Elson owned and operated Arverne. In 1982 petitioner entered into a distribution contract with Arverne, paying the firm a fee of $ 6,000 to engage their marketing services. He did not *475 have an agreement with any other distributor. Petitioner received copies of three quarterly reports dated December 30, 2982, from Arverne concerning the print sales of his three art masters. The reports indicated sales as follows: Final
Triumph
Spring
Piazza
Quantity
2 3 3 Unit price
$ 250 $ 250 $ 200 Amount
500 705 600 Less 50%
Trade Discount
(250)
(375)
(300)
250 375 300 Less 40% Arvernes
Commission
(100)
(150)
(120)
Due
$ 150 $ 225 $ 180 The reports also indicated that payments of the monies due had been applied to the fees due Arverne under its contract with petitioner for the promotion, advertising, and related expenses of the prints. Petitioner's agreements with Jackie concerning the art masters were modified in 1983. By letter dated December 18, 1983, Jackie agreed, at petitioner's request, to defer the due date of each short-term note until the due date of the long-term note of each art master. The letter stated, "These notes were due last year, but the management of 'Jackie' agreed to extend these notes until your business improved and was doing better *476 financially. Jackie also agreed to extend these notes, if necessary, until all recourse notes were due." Despite the lack of payments, Jackie did not contact petitioner after 1984 or 1985. By letter dated February 7, 1984, Arverne informed petitioner that Elson had become fully and permanently disabled and that the firm had discontinued operations. The letter advised petitioner that another art distributor, Marigold Enterprises, Ltd., had agreed to reduce their usual fee for Arverne clients who wished to engage their services. After Arverne went out of business, petitioner did not engage another distributor. Fair Market Value of Petitioner's Art Masters
The paintings of Knigin, Ensrud, and Brusca have been represented in exhibits and public, commercial, and private collections in numerous cities, principally in the United States. At the time of petitioner's acquisitions, all were living and creating art; none, however, had widespread public recognition as an artist. For "Triumph" Brusca received from Jackie $ 2,000 plus a nonrecourse promissory note dated December 30, 1980, for $ 161,000 payable by July 15, 1994, with interest at 6-percent per annum. For "Piazza" *477 Ensrud received from Jackie $ 3,500 plus a nonrecourse promissory note for $ 97,000. For "Final spring" Knigin received from Jackie $ 3,500 plus a nonrecourse promissory note for $ 136,000. The notes to Ensurd and Knigin were each dated December 31, 1981, due on July 15, 1995, with interest at 9-percent per annum. Each note was secured to the extent of the security interest received by Jackie from petitioner in the resale notes. Under his original option purchase agreement with Jackie, Ensrud did not supervise the process of creating the plates and printing the edition. Ensrud had no experience in printmaking or lithography prior to entering into the agreement with Jackie. Because he was dissatisfied with the quality of the editions, he refused to sign them. After renegotiating his contract with Jackie on May 13, 1981, Ensrud created the transparency or mylar and supervised the production of the metal plates. Knigin is an experienced printmaker and the author of two books on lithography. In regard to art masters, Knigin reproduced the image on mylar sheets. The metal plates were then made by a technician. Knigin then approved or corrected the sample prints and oversaw the *478 printing of the limited edition. Purchasers of art masters from Jackie during 1980 and 1981, including petitioner, received appraisals of their purchases from Sigmund Rothschild (Rothschild) and F. Peter Rose (Rose). Rothschild and Rose each were members of various professional appraisal associations and had experience appraising fine art. Each appraisal letter was set up on a fixed format in which were inserted the names of the purchaser, the artist, and the image, a short paragraph on the artist's reputation and style, and the appraised value of the art master package. Following his purchases of art master, petitioner received appraisals from Rothschild and Rose as follows: Image
Rothschild Appraisal
Rose Appraisal
(Date acquired)
(Date appraised)
(Date appraised)
Triumph
$ 310,000
$ 290,000
12/30/80
(1/5/81)
(1/5/81)
Final Spring
$ 360,000
$ 350,000
(12/31/81)
(1/7/82)
(1/7/82)
Piazza
$ 240,000
$ 230,000
(12/31/81)
(1/7/82)
(1/7/82)
Each appraisal was made on the basis of a tear sheet or transparency, not on the actual print. Neither Rothschild nor Rose projected in their appraisals the prices or volumes of items to *479 be sold, i.e., prints, posters, or ancillary products, or productions costs and miscellaneous fees, or specific net revenues from exploitation of the at master. None of the appraisal letters provided any data justifying the expressed opinion of value. Rothschild prepared over 1,000 appraisals for Jackie. Each of Jackie's appraisal request forms submitted to Rothschild indicated the purchase price of the art master. Jackie paid Rothschild $ 250 per appraisal. At some time after his purchase of "Triumph," petitioner prepared two sets of computer runs with respect to each of the at masters. In his computer model, petitioner distributed total sales over a 10-year period and assumed cost of sales to be 70 percent of gross revenues. He also assumed 12 percent per year inflation of sale prices and at least $ 185,697 fair market value of each art master after 10 years. The assumed fair market value was not based on fact or reasoned opinion. Both sets of projections assumed the exploitation of limited edition prints, fine art edition prints, and commercial edition prints (posters) in specific quantities and at specific initial prices. Set B differed from Set A only in that Set B *480 assumed the sale of additional posters and the exploitation of ancillary products. The projections, in relevant part, were as follows: >100> >101> Set A
Triumph
Piazza
Limited edition prints
200 at $ 300 ea.
300 at $ 200 ea.
Fine art edition
prints
2,500 at $ 100 ea.
2,500 at $ 75 ea.
Posters
10,000 at $ 25 ea.
10,000 at $ 25 ea.
Total sales
$ 988,271
$ 882,428
Fair market value
of package after
10 years
$ 185,697
$ 185,697
Net profit (loss)
($ 10,321)
$    98,476
Set B
Triumph
Piazza
Limited edition prints
-- see Set A --
Fine art edition
prints
-- see Set A --
Posters
20,000 at $ 25 ea.
20,000 at $ 25 ea.
Ancillary products
25,000 at $ 15 ea.
25,000 at $ 15 ea.
Total Sales
$ 2,259,065 $ 2,153,222
Fair market value
of package after
10 years
$   580,304
$   580,304
Net profit
$   786,918
$   911,143
Set A
Final Spring
Limited edition prints
225 at $ 325 ea.
Fine art edition
prints
2,500 at $ 115 ea.
Posters
10,000 at $ 25 ea.
Total sales
$ 1,071,623
Fair market value
10 years
$ 185,697
Net profit (loss)
($ 98,266)
Set B
Final Spring
Limited edition prints
Fine art edition
prints
Posters
20,000 at $ 25 ea.
Ancillary products
25,000 at $ 15 ea.
Total Sales
$ 2,342,416
Fair market value
of package after
10 years
$   580,304
Net profit
$   688,901
*481 The initial sales price for ancillary products represented what petitioner assumed to be an average for ancillary products. Karen Carolan (Carolan), respondent's expert witness, received a bachelor's degree in art history and developed expertise in late 19th century and 20th century art. She was employed as an appraiser by the Internal Revenue Service in 1974, and served as chairperson of the Commissioner's Art Print Panel between 1980 and 1983. At the time of trial, Carolan was chief of the Commissioner's Art Valuation Section and chairperson of the Commissioner's Art Advisory Panel. She did not have experience as a dealer of artwork. Carolan prepared a valuation report for each of petitioner's art masters in which she considered the aesthetic appeal of the image, the artist's reputation, the size of the edition, the methods of distribution of prints, and other relevant factors. She appraised the value of each art master plate at the time of the transaction to be limited to the cost of materials and production alone, not to exceed $ 1,500 and $ 2,000. With regard to limited edition prints, she determined the probable retail and wholesale prices for each image and the probable *482 percentage of sales in each category. She projected total sales "based on the following assumptions with an optimistic range of possibilities": Retail
Wholesale
1. Prices: Triumph
$ 250
$ 150
Final Spring
250
150
200
120
2. Commissions to distributor of 50% on retail and sales 25% on wholesale sales.
3. Print sales: 10% - 25% on Triumph and Final Spring 10%-20% on Piazza
4. Appreciation of 50% on 1/3 of the sales.
5. Breakdown of 1/2 retail - 1/2 wholesale of the sales.
6. An effective, knowledgeable distributor with a New York City gallery.
Carolan determined that a poster edition and ancillary products of petitioner's art masters would not have economic viability because of the limited appeal of the images and lack of importance of the artist. Because of the limited possibilities for commercial exploitation of the images, Carolan assigned "not much value" to their copyrights. Carolan's conclusions were summarized in her reports as follows: Conclusion
As yet we have not considered the production costs and other fees which must be deducted. The expenses of producing the limited edition of * * *483 * [200 for Triumph, Piazza; 225 for Final spring] were listed at $ 4,500 in the contract. The miscellaneous fees (legal, accounting, etc.) I estimate at $ 1,000. Therefore, the net revenue projections from the limited edition are as follows: Optimistic
Realistic
100%
50%
25%
10%
1. Triumph
$ 27,788.00
$ 13,893.75
$ 6,887.50
$ 2,731.25 -5,500.00
-5,500.00
-5,500.00
-5,500.00 $ 22,288.00
$ 8,393.75
$ 1,387.50
($ 2,768.75)
2. Final
$ 31,162.50
$ 15,606.25
$ 7,718.25
$ 3,156.00 Spring
-5,500.00
-5,500.00
-5,500.00
-5,500.00 $ 25,662.50
$ 10,106.25
$ 2,218.25
($ 2,344.00)
20%   3. Piazza
$ 32,250.00
$ 17,875.00
$ 7,150.00
$ 3,575.00 -5,500.00
-5,500.00
-5,500.00
-5,500.00 [sic]
$ 27,750.00
$ 12,375.00
$ 1,650.00
($ 1,925.00)
Carolan's opinions, unlike those of Rothschild, were detailed, well reasoned, credible, and persuasive. In light of the net revenues projected by Carolan, the fair market value of petitioner's art master packages was negligible. Tax Reporting
Petitioners received an extension of time to file their 1980 income tax *484 return until June 15, 1981. No further extensions were sought or granted. Petitioner's 1980 return was received at the Memphis Service Center on August 12, 1981. The 1980 return was files without a Schedule C attached. Pursuant to a request by the Internal Revenue Service, petitioner mailed a Schedule C to the Service Center. This was received in the Service Center on October 21, 1981. Petitioners' returns , on Schedules C and Forms 3468, claimed the following income, deductions, and credits for art activity and the operation of coin machines in 1980 and 1981, and art activity for 1982: 1980
1981
1982
Gross Receipts
$    296 $     500 $    0    Cost of Goods Sold
0   0    0    Gross Income
296 500 0    Depreciation
32,210 129,634 155,521 Interest Expense
0   1,875 0    Total Deductions
34,210 131,509 155,521 Net Gain (Loss)
(33,914)
(131,009)
(155,521)
Investment Tax Credit
26,500 51,200 0    The gross receipts for 1980 and 1981 were from the operation of coin machines. Deductions of $ 776 attributable to the coin machines were *485 claimed and were allowed by respondent for 1980 and 1981. Petitioner's reported basis in Triumph was $ 265,000. Petitioner used a 9-year useful life and double-declining balance method with a half-year convention for depreciation. Petitioner's reports basis in "Final Spring" and "Piazza" totaled $ 512,000. Petitioner used a 5-year recovery period. Petitioner used the same basis for the investment credit on each art master as he used for depreciation. As a result of these items, he claimed deductions of $ 33,444 in 1980, $ 130,743 in 1981 and $ 155,521 in 1982, and investment tax credits of $ 26,576 and $ 51,200, respectively, for 1980 and 1981. Petitioner reported no sales from the art masters activity on his income tax returns for the years 1980 through 1984. Petitioner made no sales between 1985 and the time of trial. Prior to September 17, 1981, the Internal Revenue Service commenced an audit of petitioners' tax return for 1980. On July 20, 1982, Jackie sent a letter to petitioner stating, among other things, the following: RE: "Triumph" by Brusca Dear Mr. Ballard: It is our understanding that you are being audited at the present time in reference to your purchase *486 of the Master Artwork shown above. I am enclosing a biographical sketch of the artist and some information about the limited edition prints. You may provide this information to the agent as requested. The agent is also entitled to review copies of all agreements between you and Jackie Fine Arts, Inc., as well as any distribution agreement, if a distributor has been selected. At the beginning stage of any audit, the agent should be supplied only with the material that related directly to your art business. According to the advice of the attorneys at Friedman & Shaftan, you should not provide the Information Memorandum or Fact sheet.
Neither the Information nor the Fact Sheet received by petitioner in relation to his purchase of "Triumph" or the other art masters has been supplied to respondent or otherwise accounted for by petitioner. In his notices of deficiency, respondent disallowed petitioners' 1980 and 1981 Schedule C losses and investment tax credits and petitioner's 1982 Schedule C losses attributable to the arts masters investments and determined additions to tax as set forth above. OPINION At the conclusion of the trial, the parties were advised that the Court *487 would initially analyze this case in accordance with our opinion in Rose v. Commissioner,88 T.C. 386 (1987), on appeal (6th Cir., Dec. 14, 1987), in which we characterized certain art master packages marketed by Jackie Fine Arts as "generic tax shelters" and concluded that they lacked economic substance and thus did not give rise to deductions and investment tax credits claimed by the taxpayers. As in Rose, respondent maintains several alternative grounds for disallowing the deductions and credits claimed by petitioner, including absence of profit objective, limitation of basis to fair market value of art master packages purchased, disregard of amounts for which petitioner was not at risk under section 465, improper allocation of the purchase price charged by Jackie, and erroneous computations of the depreciation deductions and investment tax credit. Petitioner contends that Rose is distinguishable because petitioner had a profit objective; petitioner negotiated discounts of 10 percent on the purchase price of the art masters purchased; his prepurchase investigation was "extensive"; the art masters purchased were those of living artists, who would be involved *488 in production of the prints made from them; petitioner negotiated for recourse obligations; and petitioner engaged in post-acquisition marketing efforts. Respondent argues that petitioner's uncorroborated testimony, given months after the publication of the Rose opinion, has not established any real difference between this case and Rose. We agree with respondent. Petitioner's testimony was glib, vague, uncorroborated, and not credible. In any event, he has persuaded us that his transaction with Jackie does not fall within the definition of generic tax shelters set forth in Rose, to wit: (1) Tax benefits were the focus of promotional materials; (2) the investors accepted the terms of purchase without price negotiation; (3) the assets in question consist of packages of purported rights, difficult to value in the abstract and substantially overvalued in relation to tangible property included as part of the package; (4) the tangible assets were acquired or created at a relatively small cost shortly prior to the transactions in question; and (5) the bulk of the consideration was deferred by promissory notes; nonrecourse in form or in substance. * * * *489 [88 T.C. at 412.]
We therefore apply the objective analysis adopted in Rose to determine whether petitioner's transactions with Jackie had economic substance. The Dealings Between Jackie and Petitioner
There is one notable difference between this case and Rose. The taxpayers in Rose admitted that tax consideration played a part in their decision to acquire the Picasso packages there in issue. 88 T.C. at 415. In this case, petition denied that he paid any heed to tax considerations. Yet he was professionally employed in selling tax shelters. As a result of his acquisitions from Jackie, he claimed tax benefits that would reduce his taxes by approximately $ 41,000 in 1980, $ 112,000 in 1981, and $ 78,000 in 1982. Those claims were predicated on payments to Jackie of $ 21,000 in 1980, $ 5,000 in 1981, and $ 7,400 in 1982. Conspicuously absent from the documents produced by petitioner prior to and during trial were the promotional materials that he received from Jackie prior to his purchase of the first art master. Petitioner had been advised by Jackie in 1982 not to produce to the Internal Revenue Service the information Memorandum *490 that focused almost exclusively on tax benefits. Under these circumstances, we do not have confidence in the reliability of petitioner's assertions. The second major indicia of petitioner's lack of credibility is that he purportedly committed himself to purchases of $ 512,000 on December 31, 1981, when he had not yet received that which he purchased on December 30, 1980. He testified: I got off to a very slow start with this investment. The slow start is I had a tremendous amount of difficulty getting the limited edition print of the first artist. I bought it in December of 180 and I believe I didn't get my limited edition prints in 1981 at all. They had some problems with the artist. I renegotiated initially about the timing of the payments that I was going to put on Brusca since he hadn't signed the limited edition prints. The first time he was out of the country. The second time he didn't like the artist proofs, they weren't good enough, which was fine but I didn't want to pay more money until I cold get into the business. When he was asked about this during trial, petitioner claimed that he was not dissatisfied with Jackie and believed representations that the problems *491 with "Triumph" were attributable to an eccentric artist. Petitioner may have been satisfied with Jackie because he believed that he was getting what he wanted from them, i.e., and end of the year tax shelter. See Beck v. Commissioner,85 T.C. 557, 575 (1985). There is no reliable evidence in the record of a nontax reason for the purchases on the last day of 1981. Petitioner testified that after his 1980 purchase but before his 1981 purchases, he set up a computer model and ran numbers on particular assumptions, as set forth in our findings of fact. The computer runs were prepared at the same time and included computations for an Ensrud with an "asking price" of $ 187,000 and a Knigin with an "asking price" of $ 325,000 -- the prices agreed to by petitioner. Thus, the computer runs must have been made after petitioner identified the prints that he was acquiring in 1981 and after he negotiated a discount in price. Even including his unrealistic assumptions of number of items to be sold, inflation of sales price, and fair market value after 10 years, petitioner projected losses from distribution of products to be made from two of the three art masters. He *492 then doubled the number of posters assumed to be sold and arbitrarily assumed sale of 25,000 ancillary products made from each master. On direct examination at trial, petitioner explained this process as follows: Q Did you formulate profit projection as a result of the knowledge that you had gained about the prices? A Yes, I did but profit projection to me is financial analysis. You could call it profit projections and, yes I did. Q And referring to Exhibit Number 105-DA, is that one of the profit projections you made? A Yes. The answer is yes.
On cross examination, the following occurred: As I understand this last page, based on the projections and assumptions for Mr. Brusca, these assumptions would generate gross income of $ 988,271, is that correct? A That's the number I have, yes. Q And the art master will sell for $ 185,697? A Yes. Q And that would generate a net loss of $ 10,321, is that correct? A I believe so. Q Turning now finally to the last art master, Mr. Knigin, again the last page. Using the assumptions we've already discussed, is it fair to say that you projected total sales of $ 1,071,623? A Yes. Q And you have again projected a sale *493 of the art master for $ 185,697? A Yes. Q And for those projections you end up with a net loss of $ 98,266? * * * Mr. Ballard, I was going to ask you to do the arithmetic but I'm going to save you the trouble. I'm going to tell you that if you add up the gross sales you're going to come out with $ 2,942,322 total for the three art masters, and I'm going to tell you that the sale of the three art masters will generate $ 557,091, and total receipts will be $ 3,499,413, combining the two, and this generates a net of negative $ 10,111. Now, Mr. Ballard, based on the assumptions in your projection for your second set of projections, is it fair to say that you will have over $ 3.5 million in total receipts in order for these art masters to generate a net profit? A Did you qualify your questions under these assumptions? Q Yes I did. A Under those assumptions, that answer would be yes. Q I think you testified that when you originally purchased these art masters you were planning on selling them yourself. A That correct. Q Did you believe that you could sell three and a half million dollars worth of art products? A I testified that my original plan was to establish *494 the value for the master, to establish the posture of the master for exploitation by personally selling the limited edition prints myself, which I think you will find is a fraction of that -- I think that was my testimony. Q Mr. Ballard, for the years 1980 through 1984, would you agree that your income tax returns for those years report zero gross sales of your art master? A Zero net sales, yes. Q Would you agree that for the years 1995 through 1987 you have not sold any prints, is that correct? A That is correct. Q Have you ever had any fine art editions printed? A No, because I want to establish -- Part of my original game plan is to market the limited edition print to establish the fine art edition -- to establish momentum, not completely sell out but establish momentum. I believe that is the right business strategy. Q You have not had any commercial edition posters printed, have you? A No, sir.
After a discussion of marking respondent's counsel's summary as an exhibit, petitioner stated: "They are not profit projections. I am personally concerned that one is going to draw the wrong conclusions from these computer runs." The conclusion we draw is that although *495 he claims to have investigated the art master investments over a period of 2 years prior to his first acquisition, none of the activities that he describes included an independent or realistic evaluation of the fair market value of the packages that he was purchasing. As discussed below, anticipated retail prices of products cannot be converted into fair market value without a realistic projection of the number of each item to be sold at the anticipated price. The sales necessary to achieve the income assumed by petitioner are "financial fantasies" [3] having no basis in fact. If petitioner did engage in price negotiation in relation to his 1981 purchases, it appears likely from the entire record that he was negotiating the amount of investment tax credit and deductions that he needed in that year rather than the purchase price of valuable assets. *496 Respondent argues that petitioner never made any payments on the notes given by petitioner to Jackie and that Jackie never made any attempt to enforce the notes. Petitioner contends that he negotiated deferrals in due dates on the notes. There appears to be no consideration from petitioner to Jackie, however, for such deferrals. As discussed below, the notes from petitioner to Jackie were illusory, and we conclude that they did not represent bona fide debt. We are totally unpersuaded by petitioner's argument that he negotiated price discounts and deferred payment in exchange for undertaking recourse obligations; we do not believe that there was ever any intention to pay or to collect on those purportedly recourse obligations. Petitioner testified that he initially intended personally to sell the prints made from his masters in order to establish a market. After finally receiving the prints in 1982, he contacted distributors. It is significant, however, that at the time he received the prints and commenced his marketing activities, an audit of his tax liability for 1980 had already commenced. In any event, his minimal activities were hardly commensurate with an alleged business *497 or profit-motivated activity involving assets acquired at purchase prices totaling $ 777,000, of which over $ 700,000 was still owing. Petitioner's claimed profit objective is particularly incredible in view of his "guess" during trial that his net worth at the time of acquisition was approximately $ 200,000. Not surprisingly, petitioner did not report any income from exploitation of his art masters during the years in issue, and no admissible evidence was presented of actual sales at any time. Although his assumption that he could make a profit required that he sell 7,500 prints, 60,000 posters, and 75,000 ancillary products, he never arranged for production of more than 300 prints from any art master. There is absolutely no reason to believe that any profit was possible under the terms of the agreement between petitioner and Jackie, and there is every reason to believe that petitioner did not have any actual or honest profit objective when he entered into his agreements with Jackie. Relationship Between Sales Price and Fair Market Value
Throughout the history of this case prior to trial, during trail, and in his brief, petitioner has argued that the projected selling *498 price of limited edition prints was "reasonable." He ignores the crucial question of whether sales could be achieved in the volume necessary to sustain any viability in the activity in which petitioner was involved. Rothschild was petitioner's sole expert witness at trial regarding the fair market value of petitioner's art masters. Rothschild did not provide a schedule purporting to justify his original appraisals. Rothschild testified that his appraisals of the art masters were based on sales and profit projections. He presented price lists of the artists' prints in the Print World Directory. Print World Directory was originally published in 1982 and lists the suggested retail prices, which in practice are ordinarily discounted, rather than actual sales prices. The asking price in the directory presented by Rothschild was more than the price at which petitioner was offering certain prints for sale. Rothschild criticized respondent's expert relying on "auction prices" that were sometimes, according to Rothschild, inflated. Petitioner could hardly be hurt by respondent's use of inflated prices! His testimony contradicted, rather than supported, petitioner's assumption of *499 inflation of 12 percent per year applicable to prints. Finally, Rothschild admitted that, when he signed the appraisals provided to petitioner, he did not even know whether the technique to be used by the artist was going to be serigraphs, stone engravings, or mylar color separations. In explaining that it was unimportant to him who would actually make the mylars or the plates, he stated: Q So you understood the artist would sign these editions but you did not know who would actually make the mylars or the plates, is that correct? A Any number of production companies could make the mylars without even printing them. It's a photographic process, color separation process. Q So in your mind the making of the mylars is a mere mechanical process. It's not an artistic process? A It requires a degree of artistry but in the end result it's the printing technique and the printer who does the transfer of the mylar to the finished sheet is the responsible person and that is part of the process. Petitioner harshly criticizes respondent's expert, Karen Carolan (Carolan), for lack of actual experience in selling prints. *500 As in Rose v. Commissioner, 88 T.C. at 401-402, 418, we are faced with a record in which Carolan's opinion, although having weaknesses, is the best available. She is the only witness in this case who attempted to convert potential sales prices to fair market value of the asset purchased by petitioner. See Parker v. Commissioner,86 T.C. 547, 562-565 (1986); Beck v. Commissioner,85 T.C. at 578-579. Amazingly, petitioner and Rothschild ignore the patent effect on potential sales of simultaneous marketing of comparable products in comparable volume from over 2,200 packages sold by Jackie about the time of or prior to petitioner's acquisitions. See Skripak v. Commissioner,84 T.C. 285, 324-325 (1985); Estate of Baron v. Commissioner,83 T.C. 542, 556-558 (1984), affd. 798 F.2d 65 (2d Cir. 1986). Petitioner and Rothschild insist on assuming maximum potential sales, ignoring the improbability of those sales, and offer nothing that can be reasonably regarded as evidence of fair market value. Structure of the Financing
*501 The presence of deferred debt that is in substance or in fact not likely to be paid is an indication of an absence or exaggeration of economic substance. Rose v. Commissioner,88 T.C. at 419, and cases cited therein. The nonrecourse debt in this case was not likely to be paid because the revenues from which it would be paid were not likely to be received. Payment of the face amount of the recourse portions of the deferred notes, whether full or partial, was also unlikely. In the event of default, the "appraised" value of the art master would be applied against the so-called recourse amount before personal liability could be enforced. Jackie would be in a port position to assert that the collateral was worth much less than the original sales price. The potential for manipulation in the application of the collateral appraisal provisions effectively made the debt illusory. Petitioner was thus insulated from personal liability on the notes. His relative inactivity with respect to the exploitation of the art masters, given the face amount of the notes (representing two to four times his net worth at the time of acquisition), cannot be explained if he actually intended *502 to repay the notes. Enforcement of the notes is also highly improbable under the facts and circumstances of this case. Jackie did not need partial or full recourse notes to protect its financial interests. Jackie's long-term, nonrecourse debts to the artist for rights to the images were secured by the same collateral that Jackie would receive from petitioner upon the latter's default. Bernard W. Indyke, a manager of Jackie from 1980 to 1986 and a member of Jackie's board of directors at the time of trial, testified that on several occasions Jackie has taken back limited edition prints as security in settlement of a lawsuit or disagreement; however, to his knowledge Jackie has never attempted to enforce its long-term notes when an investor defaulted. Jackie did not seek to enforce the terms of petitioner's short-term notes, when prior to renegotiation of the due date, he was in default. Despite the lack of payments, Jackie did not contact petitioner after 1984 or 1985. With respect to perceived congressional intent, we refer to and incorporate the discussion *503 Rose v. Commissioner,88 T.C. at 421-422. Petitioner's transactions with Jackie lacked economic substance and do not support any deductions or investment tax credits. Additions to Tax Under Section 6659
Section 6659 provides for an addition to tax for underpayment of tax attributable to valuation overstatements. Under section 6659(c) a valuation overstatement occurs if the adjusted basis of any property claimed on any return is 150 percent or more of the amount determined to be the correct amount of such adjusted basis. Because we have found that the transactions between petitioner and Jackie lacked economic substance, they cannot be recognized for tax purposes. Thus, petitioners have no adjusted basis for purposes of depreciation or investment tax credit. See Rose v. Commissioner, supra;Zirker v. Commissioner,87 T.C. 970, 979-980 (1986). The adjusted bases claimed on the tax returns far exceeded 250 percent of the correct basis -- zero. Thus, an addition to tax equal to 30 percent of the underpayment attributable to the valuation is appropriate, as respondent urges. See section 6659(a) and (b). Petitioner argues *504 that respondent abused his discretion by failing to waive the addition under section 6659(e)[4] because his reliance on the amounts of the purchase notes and the appraisals in determining his reported basis in the art masters was reasonable and made in good faith. There is no abuse of discretion here. As discussed above, petitioner's purchase notes were illusory and not likely to or intended to be paid or enforced. The appraisals were supplied by the promoter after the notes were executed and had no relationship to a realistic fair market value. Petitioner did not obtain any independent appraisal. Neither the appraisal nor the amount of the notes were reasonable, and we are not persuaded that petitioner's claims were made in good faith. Additional Interest Under Section 6621(c)
[Formerly Section 6621(d)] *505 Section 6621(c) provides for an increased rate of interest on underpayment attributable to tax-motivated transactions, including "any valuation overstatement (within the meaning of section6659(c))" and "any sham or fraudulent transaction." Section 6621(c)(3)(A)(i) and (v). The provisions of section 6621(c) are designed for and applicable to transactions such as petitioner's dealings with Jackie. See Cherin v. Commissioner,89 T.C. 986, 1000-1001 (1987); Patin v. Commissioner,88 T.C. 1086, 1128-1129 (1987), affd. sub nom. Hatheway v. Commissioner,     F.2d     (4th Cir., Aug. 23, 1988); Rose v. Commissioner,88 T.C. at 424-427. Decisions will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code as amended and in effect during the years in issue, except as otherwise noted. ↩
2. Section 6621(d) has been redesignated as section 6621(c)↩ by section 1511(c)(1)(A) of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, 2744. 3. In Saviano v. Commissioner,765 F.2d 643, 654 (7th Cir. 1985, affg. 80 T.C. 955 (1983), the Court of Appeals for the Seventh Circuit stated: The freedom to arrange one's affairs to minimize taxes does not include the right to engage in financial fantasies with the expectation that the Internal Revenue Service and the courts will play along. The Commissioner and the courts are empowered, and in fact duty-bound, to look beyond the contrived forms of transactions to their economic substance and to apply the tax laws accordingly. That is what we have done in this case and that is what taxpayers should expect in the future. ↩
4. section 6659(e) provides as follows: (e) Authority to Waive. -- The Secretary may waive all or any part of the addition to tax provided by this section on a showing by the taxpayer that there was a reasonable basis for the valuation or adjusted basis claimed on the return and↩ that such claim was made in good faith. [Emphasis supplied.]